UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | |
|---|---|
| GUY M. LERNER, M.D. | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )    NO. 3:12-CV-565-R |
| | ) |
| ERIC K. SHINSEKI, et al. | ) |
| | ) |
| Defendants | ) |

*ELECTRONICALLY FILED*
**PLAINTIFF'S BRIEF**

Comes the Plaintiff, Guy M. Lerner, M.D., by counsel, and submits his Brief.

## INTRODUCTION

This action is an appeal of the Under Secretary's August 10, 2012 entry of the Disciplinary Appeals Board's ("DAB") April 16, 2012 ruling, upholding a suspension issued by the Veterans Administration ("VA") against Guy M. Lerner, M.D. The Under Secretary upheld the DAB's recommendation to issue a five-day suspension, reduced from the ten-day suspension recommended by Wayne Pfeffer, the Facility Director of the Robley Rex Veterans Affairs Medical Center. Even the reduced suspension is deficient under 38 U.S.C. § 7462(f)(2), in that it is arbitrary and capricious, contrary to due process, and not supported by substantial evidence.

## FACTUAL BACKGROUND

Guy M. Lerner, M.D. is a Title 38 employee at the Robley Rex Veterans Affairs Medical Center ("VAMC") in Louisville, Kentucky. He is a physician, board certified by the American Board of Anesthesiology, with a sub-specialty qualification in Pediatric Anesthesia. He is the sole physician provider at the Robley Rex VAMC Pain Clinic, where he consults with and treats thousands of the VAMC's constituent patients. Dr. Lerner has worked in this capacity since his

employment began in January, 2007, during which time he has seen approximately 2,000 patients per year. He has been a practicing Pain Management specialist for over 20 years.

Dr. Lerner had an unblemished disciplinary record at the VA until 2010. In that year, Dr. Lerner first began to experience conflict with Dr. Edwin Earl Gaar, the VAMC's Chief of Surgical Service and his direct superior. In February, 2010, the Joint Commission on the Accreditation of Health Care Organizations ("JCAHO") conducted an audit of the Robley Rex facility and observed the Pain Clinic. The auditors found Dr. Lerner responsible for two violations regarding "time out" procedures, including marking of syringes, and documentation concerning procedures. Upon being notified of these failures, Dr. Lerner promptly corrected these behaviors.

Despite these corrections, Dr. Gaar initiated a disciplinary fact-finding investigation against Dr. Lerner in July, 2010. The topic of the fact-finding was whether Dr. Lerner followed appropriate procedures in creating medical records, labeling syringes, placing marks on patients (i.e. marks to identify the site of a procedure), and washing hands at times designated by protocol prior to a procedure. These last two infractions had been observed by the hospital's own Joint Commission Readiness team before the visits by JCAHO in February, 2010. As with the other items for which JCAHO had issued citations, Dr. Lerner had immediately conformed his behaviors, long before the investigation was initiated. On October 27, 2010, Dr. Lerner wrote to Dr. Gaar protesting the fact-findings, as they were based on old incidents and referred to conduct that had already been corrected.[1]  Nonetheless, Dr. Gaar pursued corrective action in the form of a reprimand, which Dr. Lerner received only in February, 2011, nearly a year after the perceived infractions. Dr. Lerner responded to the proposed reprimand in writing to the facility's Chief of Staff, Dr. Marylee Rothchild, by letter dated February 25, 2011, asserting that the charges were unfounded, and further

---

[1] *See* R.A. 108-109.

that the policy violations regarding medications and labeling referred to conduct long addressed and corrected.[2] Dr. Rothchild modified the proposed reprimand to an admonishment, which was issued in April of 2011 – more than a year after the alleged violations.[3]

During the same time period, and for much of 2010 and 2011, Dr. Lerner felt he was deliberately excluded not only from making decisions for the clinic for which he is responsible, but also from taking part in any decision-making discussions, including medical decisions for which he may be the only expert. Throughout this time period, Dr. Lerner verbalized these concerns to Dr. Gaar, his direct superior, and to Dr. Rothschild, the Chief of Staff. Dr. Lerner felt that the increasing workload that he was being asked to accept was jeopardizing the quality of patient care.[4]

On April 26, 2011, Dr. Gaar sent an e-mail to the surgical staff. As a member of the Department of Surgery, Dr. Lerner also received the e-mail. In that case, Dr. Gaar advised surgeons to curb what had become a recognized practice of leaving the facility before the completion of surgeries that they had been assigned to attend, a major violation of national accreditation standards. Dr. Gaar's e-mail stated: "Recent incidents in the OR regarding attending coverage have occurred that are contrary to national policy concerning resident supervision in the operating room." Dr. Gaar continued: "There have been several instances where I have been called back to the room to help the residents in a difficult situation after their 'attending' had choose to leave the building and premises. While I don't mind doing this at all, there are many instances when I might not be

---

[2] *See* R. A. 110-112.

[3] *See* R. A. 335-38, Agency Exhibits M-4 and M-5.

[4]Dr. Lerner's supervisors also learned that he had spoken at a community meeting about the proposed relocation of the VAMC facility. Dr. Lerner spoke as a concerned citizen, understanding the unique needs of the various constituencies involved. He was neither expected nor required to participate in this private speech in the course of his employment. In November, 2010, this resulted in a fact finding in which Dr. Lerner was told he was being investigated for violating the Hatch Act.

around." In the letter, Dr. Gaar also mentioned the fact that there will be a "VASQIP inspection of the entire surgical service due to our poor numbers as it relates to operative mortality for FY2010."[5]

The discord between Dr. Gaar and Dr. Lerner increased after Dr. Lerner circulated this correspondence to Dr. Gaar's superiors, among others, in conjunction with his inquiry into why he was subjected to scrutiny and discipline for far lesser infractions, while major deficiencies such as this were left unaddressed. By letter dated June 15, 2011, Dr. Lerner's prior counsel, Rand Kruger, Esq. directed a letter to Dr. Gaar, protesting the disparate treatment to which Dr. Lerner had been subjected, and contrasting this to Dr. Gaar's apparent indifference to far more serious infractions. Mr. Kruger's letter was sent to Dr. Gaar, but also copied to Dr. Gaar's superior, Wayne Pfeffer, Director of the Robley Rex Medical Center, and John Dandrige, VISN 9 Director. As Mr. Kruger noted:

> Your attitude toward Dr. Lerner is outrageous, unprofessional and unwarranted. Dr. Lerner is a very capable and well-liked physician, and he enjoys his work at the Pain Clinic. He has been the subject of many reports from patients to the administration who have expressed their gratitude to him over the years. Other than harboring a grudge and seeking to retaliate against Dr. Lerner, it is inconceivable that you would devote so much attention and waste such an incredible amount of time over hypercritical, nitpicking perceived infractions, bordering on the absurd (including whether Dr. Lerner "ate" a peanut in a restricted area as opposed to picking it up off the floor), when you should be extremely troubled with (and one would think at least as focused on) the fact that your attending physicians are violating national policy concerning resident supervision in the operating room. As you have admitted, there have been several instances where attending physicians chose to leave the hospital premises and were not around to help the residents performing a procedure unsupervised. Obviously, when this happens, should they run into trouble, patient safety is necessarily compromised. This is also in direct violation of a most material, if not essential, policy that they remain in the operating suite until the procedure is terminated. By your own admission, the Louisville VAMC surgical service has

---

[5] "VASQIP" is an acronym for the "VA Surgery Quality Improvement Program."

> posted poor numbers as it relates to operative mortality for the prior fiscal year. Therefore, one would think that enforcing this policy would be a lot more important and require more of your time than the list of petty, non-material nitpicking infractions for which you apparently have time to reprimand Dr. Lerner. We query whether any of these attending physicians were ever reprimanded.[6]

Dr. Gaar did not respond to Mr. Kruger's letter, and instead continued to investigate Dr. Lerner, and to seek a basis for imposing discipline upon him.

In what seems an extreme temporal coincidence, the six alleged patient complaints that form the basis of the instant discipline began June 16, 2011, one day after the date of the above-quoted correspondence from Dr. Lerner's counsel. On June 16, 2011, Dr. Gaar's Administrative Assistant, Eva Egolf, had conducted a "Weingarten Meeting"[7] as part of a fact-finding related to Dr. Lerner, allegedly relating to issues concerning "time out" procedures, medication vials, interaction with a nurse practitioner, and alleged blogging by Dr. Lerner.[8] No charges or discipline arose out of this Weingarten Meeting.

Immediately thereafter, however, Dr. Gaar and Ms. Egolf turned their attention away from investigating the procedural issues that Dr. Lerner had remedied long before, and turned their attention to allegedly inappropriate patient interactions. It is from this renewed inquisition that the instant suspension emanates. On July 13, 2011, Ms. Egolf, at Dr. Gaar's direction, conducted yet another fact-finding meeting, this one relating to alleged inappropriate comments made by Dr.

---

[6] R. A. 119, 120, Government Exhibit A9.

[7] A "Weingarten Meeting" refers to the Supreme Court's decision in *N.L.R.B. v. J. Weingarten, Inc.*, 420 U.S. 251 (1975), in which the Court afforded unionized employees "the right to insist on the presence of a union representative at an investigatory interview with employer personnel which he reasonably believes will result in disciplinary action." *See Spartan Stores, Inc. v. N.L.R.B.*, 628 F.2d 953, 957 (6th Cir. 1980).

[8] *See* R. A. 278-286.

Lerner to patients.[9]  All of these complaints are alleged to have been received between June 15, 2011

and July 7, 2011, the three-week period after the letter from Dr. Lerner's counsel to Dr. Gaar.  Each

of the alleged complaints leading to the charges merits discussion.

Charges A and B against Dr. Lerner emanate from a single patient encounter that occurred

on June 29, 2011.  In the Weingarten Meeting, and again at the hearing before the DAB, the VA has

implied that Dr. Lerner referred to the patient's wife as a "dummy," and further that he called the

patient's son a "big gorilla." Before the Disciplinary Appeals Board, the VA repeatedly emphasized

that this had been understood by the patient or his family, who are African-American, as a racial

slur.[10]  The evidence, however, was to the contrary.

Dr. Lerner and his co-worker testified that Dr. Lerner regularly speaks of "working out like

gorilla" with reference to building strength, as part of his emphasis on physical fitness, which is

important for much of his patient base.[11]  Dr. Lerner employs this figure of speech without regard

to race, as confirmed by testimony of co-workers.  Just as striking is that, in the actual notes of the

patient complaint, there is no suggestion either that the term was used as an epithet by Dr. Lerner,

nor that it was perceived by the patient or his family as such.  Instead, the patient's wife, after

detailing her dissatisfaction with her interaction with Dr. Lerner, "mentioned that she did not know

if this treatment was because they are African-American."[12]  This encounter became the predicate

---

[9]  *See* R. A. 267- 274.

[10]  *See* R. A. 168-169 (pp. 64-66 of hearing transcript).

[11]  *See* R. A. 167 (p. 59 of hearing transcript); R. A. 223 (p. 281 of hearing transcript); R. A. 225 (p. 289 of hearing transcript).

[12]  Report of Contact dated June 30, 2011, R. A. 277.

for Specification A in support of the Charge for which Dr. Lerner was suspended.  The VA did not call either the allegedly complaining patient or any member of his family at the DAB hearing.

The complaint that gave rise to Specification B in support of the instant charge concerned a request from the same patient's wife to secure pain medicine for her husband.  The VA alleges that Dr. Lerner responded to this inquiry by asking the patient's wife "Who's the patient here?" or words to this effect.[13]  Ms. Egolf's inquiry concerning this event, as recorded in the Weingarten Meeting, was as follows:

> 4.  It was also reported that when the wife asked if you could give the patient something for discomfort, you asked "who's the patient here?" Is this true?
>
> Reply:  Dr. Lerner stated that he did not recall that.  He stated that he has lots of patients asking him to give them inappropriate medications.
>
> If so, why did you ask that?
>
> (Question not asked.)
>
> If not, why would they report that you had said that?
>
> Reply:  Dr. Lerner stated that he had no idea.  He stated that/maybe they misunderstood.
>
> Do you think is was appropriate to say that to the patient's wife?
>
> Reply:  Dr. Lerner stated he doubted he said that.  He said it would be inappropriate.[14]

This meeting represents the entirety of the VA's factual investigation into this charge.  Ms. Egolf did not speak to the patients or review the charge.

---

[13] *See* Notice of Proposed Suspension, September 29, 2011, R. A. 34.

[14] Weingarten Meeting Report, July 13, 2011, R. A. 270-271.

7

The VA's third charge of inappropriate conduct relates to a patient encounter that took place July 7, 2011, only a week after the encounter giving rise to the first two charges. On this occasion, a patient allegedly called Nurse Manager Patrice Gordon to complain that Dr. Lerner had directed the patient to complain to the surgery department about staffing and delay issues. According to the note transmitted by Ms. Gordon to Eva Egolf,

> The patient also stated that Dr. Lerner told him that the surgery dept. is trying to get rid of him. The patient stated he thought this was an inappropriate thing for Dr. Lerner to say to him, why would he discuss this with me, the patient asked? The patient also stated he was almost afraid to report these comments because he was afraid Dr. Lerner would refuse to treat him.[15]

Ms. Egolf did not speak directly with the patient or otherwise attempt to probe the statement made to Ms. Gordon.[16] In Ms. Egolf's fact-finding meeting of July 13, 2011, she confronted Dr. Lerner about this interaction:

> 3. The patient reported you told him that the Surgery department tells you when you can do pain blocks, that the patient would have to wait six months for one because the nurse had quit, you were doing them all by yourself and that he should call the Surgery department to complain. Is this true?
>
> Reply: Dr. Lerner stated no. He stated the patients are unhappy. He sends them to the patient advocate when they are unhappy because they cannot get the service they used to get.
>
> *******
>
> Do you think it is inappropriate to make this sort of comment to a patient?
>
> Reply: Dr. Lerner stated that he did not make the comment to the patient. He said it was not appropriate and he did not make it.

---

[15] R. A. 275.

[16] *See* R. A. 160 (p. 31 of hearing transcript).

8

********

4. The patient also reported that you told him the Surgery department is trying  to get rid of you.  Did you say this?

Reply:  Dr. Lerner stated nope.

********

If not, why would the patient report you saying it if you didn't?

Reply:  Dr. Lerner stated that he didn't know.[17]

Accordingly, while Dr. Lerner confirmed that clinic resources had caused patients to experience significant delays in treatment, he expressly denied discussing facility business with any patient. Ms. Egolf did nothing further to investigate its merit.

Charge D emanated from another alleged patient complaint, this one concerning a patient who had worn a University of Louisville hat to his appointment, and whom Dr. Lerner had apparently questioned over his allegiance to the University of Louisville.  According to Ms. Egolf's notes, Dr. Lerner had inquired whether the patient was "a real U of L fan" and made some comment about how "they couldn't get anyone into the NBA."[18]  Ms. Egolf's report of her telephone conversation with the allegedly aggrieved patient indicates that the date of this patient's visit was June 22, 2011.[19]  This innocuous interaction became Charge D of the Veterans Administration Complaint.  The silliness of the charge led the Agency's counsel to state, on the record, that, "I am

---

[17] R. A. 273, Agency Exhibit M-1B, Weingarten Notes of Eva Egolf.

[18] Ms. Egolf's report actually refers to the MBA, but one presumes that this is a typographical error, and that the alleged conversation concerned the National  Basketball Association.  The success of University of Louisville graduates in post-graduates business administration programs is probably known and studied in some circles, but seems an unlikely subject of casual conversation.

[19] R. A. 288.

9

going to be perfectly honest with you . . . that just seems like bedside manner. I mean, if somebody's wearing a U of L hat, it just – it just seems like he was trying to be friendly[.]"[20] Despite this common sense assessment of its attorney, the Agency pursued the frivolous charge as part of the disciplinary proceeding. In her testimony, Ms. Egolf justified pursuing charges for this action on the basis that "the patient just didn't feel comfortable with that."[21] The patient, of course, did not testify.

Charges E and F against Dr. Lerner did not relate to patient interactions, but instead to his demeanor in the face of being investigated and scrutinized by Dr. Gaar and his minions. Charge E arose after Ms. Egolf and another nurse questioned Dr. Lerner about his blogging and outside financial activities, to which Dr. Lerner replied that this was none of the Agency's business.[22] The charge alleged that he raised his voice in a manner that was unjustified.[23] Finally, Charge F alleged that during one of his Weingarten meetings with Ms. Egolf, Dr. Lerner "laughed" at one point, and that at another point, he "aggressively" commented that the Weingarten reporter "should not be taking personal calls, or words to that effect."[24] The VA found Dr. Lerner's alleged conduct during these investigations "unprofessional and inappropriate," and Dr. Gaar's eventual notice of suspension referred to these alleged incidents as "very serious."[25]

---

[20] R. A. 161-62, (pp. 36-37 of hearing transcript).

[21] *Id.*

[22] *See* R. A. 265, Agency Exhibit M-1A, Proposed Ten-Day Suspension Letter.

[23] *See id.*

[24] *Id.*

[25] *Id.*

Dr. Gaar was the individual who proposed Dr. Lerner's suspension, though at the later hearing he would disclaim responsibility for the decision.  By letter dated September 29, 2011, Dr. Gaar advised Dr. Lerner that he was proposing a ten-day suspension, based on the six charges of inappropriate conduct.[26]  Dr. Gaar's proposal went to Medical Center Director Wayne Pfeffer.  Dr. Lerner responded to the proposed suspension by way of a letter to Mr. Pfeffer, dated October 21, 2011.[27]  In this reply, Dr. Lerner protested both that each of the six factual allegations was unsupported, and also alleged that the escalating nature of complaints against him was indicative of retaliation by Dr. Gaar for various protected communications in which Dr. Lerner had engaged – specifically notification to superiors of lax practices at the facility regarding supervision by attending surgeons:

> All of these attacks on my client have occurred after your superiors were alerted to the gross failures in surgery under your supervision. When attending physicians choose to leave the hospital premises and are not around to help the residents performing a procedure unsupervised, there is a major breach of protocol (not even remotely comparable to the litany of "Mickey Mouse" compliance warnings and hearsay gibberish listed in your suspension letter).  When an attending physician is not available for a resident performing a procedure unsupervised, patient safety is unnecessarily and, quite possibly, catastrophically compromised.  This is also in direct violation of a most material, if not essential, policy that attending physicians remain in the operating room suite until the procedure is terminated.  Would you not consider this grossly inappropriate conduct?[28]

---

[26] *See* R. A. 34-36.

[27] *See* R. A. 37-38.

[28] R. A. 37.

Dr. Lerner's letter received no response, but by letter dated November 21, 2011, Mr. Pfeffer

sustained Dr. Gaar's recommendation and issued a ten-day suspension to Dr. Lerner.[29]  In support

of this severe penalty, Mr. Pfeffer wrote:

> 2.  In reaching this decision, I carefully considered all the evidence developed along with the information provided to me in your written reply dated October 21, 2011, and your oral reply on November 2, 2011.
>
> 3.  I also considered other factors, including your years of service, your past work record, the seriousness of the offense, and whether there are any mitigating or extenuating circumstances which would justify mitigation of the proposed penalty.  I determined that there were several overriding aggravating factors, including your past history of misconduct, the clarity with which you were on notice, and your apparent lack of potential for rehabilitation.  I have, therefore, determined that a ten (10) day suspension is appropriate and within the range of reasonableness.[30]

By letter dated December 6, 2011, Dr. Lerner invoked his right to a hearing before the DAB, on the

basis that the charges against him were unfounded, and further that they emanated from a campaign

of retaliation to his reports of breaches of protocol regarding surgeries.[31]

In January, 2012, despite the pendency of his appeal, and even before the DAB had the

opportunity to schedule Dr. Lerner's appeal hearing, the Agency required Dr. Lerner to serve the

suspension.  Dr. Lerner was barred from practicing medicine at the VAMC for ten days, prior to any

opportunity to be heard on his appeal.  The VA's Bylaws authorize summary suspension for a

number of enumerated violations,[32] including those that might endanger patients, but at the DAB

---

[29] *See* R. A. 39-40.

[30] *Id.*

[31] *See* R. A. 41-43.

[32] *See* Bylaws, Rules, and Regulations of the Medical Staff, R. A. 70-71.

hearing, VA representatives were unable to cite any authority for summarily suspending Dr. Lerner without allowing him due process.  Indeed, when confronted with the patent inadequacy of any evidence that Dr. Lerner had done anything wrong, the same VA representatives conceded not only that the complaints did not implicate patient safety, but also that none of the alleged violations involved any allegedly intentional conduct.[33]   As the VA's representatives were forced to admit, Dr. Lerner was summarily suspended based on nothing more than the alleged subjective perceptions of the complaining patients, none of whom were called to testify, and none of whom were even interviewed by his inquisitors.

The Under Secretary for Health appointed a Disciplinary Appeals Board, as announced in correspondence dated February 16, 2012 from William Becker, M.D., the Board's Chairperson.[34] By teleconference of February 24, 2012, the DAB conducted a pre-hearing conference, at which Dr. Lerner, through counsel, requested additional discovery regarding the alleged complaints, as well as contrary evidence, including the myriad complimentary reports in his personnel file from some of the many thousands of patients whom he had greatly helped over his tenure.[35]  The DAB denied these requests, except with regard to Dr. Lerner's request for his own personnel file, which it indicated he could secure by written request.[36]

The DAB conducted a two-day hearing on March 12 and 13, 2012.  Testifying before the DAB, Ms. Egolf, the primary witness in support of the suspension, confirmed that she is not an investigator at all, but instead the Administrative Assistant to the surgical department and Dr. Gaar.

[33] *See* R. A. 218 (p. 262 of hearing transcript); R. A. 243 (p. 364 of hearing transcript).

[34] *See* R. A. 145-147.

[35] *See* R. A. 148.

[36] *See* R. A. 149-150.

Ms. Egolf identified her relationship to Dr. Lerner as "like support staff. I give guidance, technical advice to not only Dr. Lerner, but all of the physicians and staff under surgical services."[37] Ms. Egolf admitted that she reports directly to Dr. Gaar, in his capacity as Chief of Surgery.[38] Ms. Egolf explained how she came to be the sole investigator and evaluator of the allegations:

> A.    I conducted the fact findings for a couple of reasons. Dr. Gaar is a working physician, he does surgery pretty much every day of the week, so he does have patient care duties both in the operating room and in the surgery clinics. Also, I conducted the fact finding because they, there was one meeting with Dr. Gaar and Dr. Lerner that Dr. Gaar felt that Dr. Lerner had become very confrontational with him and he just, Dr. Gaar just felt it would be better if he separated himself from that, so I conducted the fact finding.[39]

When queried by the DAB Chairperson whether she had consulted with senior members of VAMC leadership during her investigation, Ms. Egolf testified that she may have mentioned the investigation to Dr. Rothschild, but "I don't know if she had decisions as far as how we were going to proceed."[40]

Dr. Gaar testified that he delegated the investigation to his secretary,[41] and candidly admitted that he did so because of his own history of personal conflict with Dr. Lerner:

> A.    Well, I had several meetings with Dr. Lerner, trying to speak with him and unfortunately, it has been fairly difficult to communicate with him. He tends to be argumentative, loud,

---

[37] R. A. 159 (p. 28 hearing transcript).

[38] *See id.*

[39] R. A. 159-160 (p. 28-29 hearing transcript).

[40] R. A. 169 (pp. 67-68 of hearing transcript).

[41] *See* R. A. 191 (p. 153 of hearing transcript)

14

> get in your face, and quite frankly, I thought it would be best
> to take myself out of the whole process and get an unbiased,
> third party to look at the facts and evidence.[42]

As if to corroborate his disdain for Dr. Lerner, Dr. Gaar specifically testified that he distanced himself from the investigative process and "didn't waste any time, because I didn't devote any time to Dr. Lerner."[43]  Dr. Gaar went so far as claim ignorance of the charges giving rise to the suspension:

> Q.    Are you aware of the charges that gave rise to your proposed
>        suspension [of Dr. Lerner]?
>
> A.    Just from what I've reviewed briefly before coming here,
>        yes.[44]

Despite professing his own lack of involvement, Dr. Gaar conceded, in response to inquiry from the DAB Chairperson, that he was responsible for the contents of Ms. Egolf's suspension proposal.[45] Even then, however, Dr. Gaar insisted that he had not been involved in selecting the penalty, and had relied for that on  the Agency's Human Resources personnel.

Dr. Gaar's claims of noninvolvement, however, were directly refuted by his VAMC Medical Center Director, Wayne Pfeffer.  Mr. Pfeffer testified that in reviewing and completing the checklist of "Douglas Factors" prior to executing the suspension,[46] he received detailed input from Dr. Gaar:

---

[42] *Id.*

[43] R. A. 196 (p. 173 of hearing transcript).

[44] R. A. 192 (p. 158 of hearing transcript).

[45] *See* R. A. 198 (p. 184 of the hearing transcript).

[46] *See* Agency Exhibit M-3, Douglas Factors Checklist, R. A. 332-334.  Mr. Pfeffer testified on the Agency's behalf regarding the appropriateness of the ten-day proposed (and, at that point, already executed) suspension.  He walked through a checklist that contained "Douglas Factors," noting that it was his responsibility to evaluate whether special circumstances tended to aggravate or mitigate the proposed penalty.  *See* R. A. 201-203 (pp. 196-201 of hearing transcript).  Mr. Pfeffer

> A.    I met with Dr. Gaar and he then went through each of the charges and talked about the rationale and looked at some paperwork, documentation, the reported contacts and gave me a clear picture of why they were charging what they were charging.
>
> ****
>
> Q.    And what was his view?
>
> A.    That this was sustainable that Dr. Lerner was very arrogant and in fact to him, to where he had a hard time in his office talking one on one to Dr. Lerner.
>
> Q.    So, he participated actively in the – in the process of giving you information just at the meeting?
>
> A.    Yes.[47]

Unsurprisingly, given Dr. Gaar's profound involvement, Pfeffer found that many of the factors were aggravating, and militated in favor of more severe punishment. Notably, however, each of these factors related to Dr. Lerner's alleged hostility to his superiors, in contrast to which Pfeffer expressly noted that his record of patient care was unexceptionable.[48]

In addition to directly refuting Dr. Gaar's claims on non-involvement in the selected discipline, Mr. Pfeffer's testimony also cast doubt on the propriety of using fact-finding as an investigative tool, rather than a more robust or formal investigation. When the DAB Chairperson asked Mr. Pfeffer whether the Agency had considered an administrative investigation, which would have involved calling witnesses, Mr. Pfeffer responded:

---

weighed heavily against Dr. Lerner his impression of Dr. Lerner's "arrogance" and "attitude" in the process of defending the action, as Dr. Lerner gave "no admission of any wrong doing [sic] and actually, he tried to say that nothing was done wrong[.]" *Id.*

[47] R. A. 203 (pp. 201-02 of hearing transcript).

[48] *See* R. A. 202 (p. 198 of hearing transcript).

16

I thought about that, because we do some, but I didn't think it rose to that level, to do a formal investigation. Employee misconduct wasn't egregious enough, I wouldn't think to do an AID, I didn't feel that way. Human resources if they feel it might warrant an AID would suggest that to me and that was not discussed.[49]

The Agency 's Human Resources Specialist, Jennifer Vaught, also testified, but her testimony about

why the VA did not perform a more robust and complete investigation contradicted Mr. Pfeffer's:

A.     Normally what occurs is that *a supervisor* will contact Human Resources Specialist, which is myself. And, tell us about the incident that occurred. And, we advise them of what necessary process they may, steps they may take next. Such as, investigation. It might be a Weingarten meeting, in which if they are already a Union employee, we would apprise them of their right to have Union representation. Also, in collecting of the witness statements of persons who may have witnessed the incident that occurred.

Q.     After the fact finding is done, then what happens?

A.     Then, *the supervisor* will normally contact Human Resources again. And, we will normally meet with them to go over the evidence they have collected. And, evaluate it and see if it will substantiate the charge. Or, if possibly [sic], we need to gather any additional evidence so that we could either again, account or discount the incident.

Q.     What goes into the decision of how to do a proposal and what charges to make? And, what kind of discipline to be proposed?

A.     We sit down with *the supervisor*. And, we review the table of penalties. We review the evidence with them to see what proper penalty that they feel is reasonable.[50]

---

[49] R. A. 209 (pp. 226-27 of hearing transcript).

[50] R. A. 210 (pp. 231-33 of hearing transcript) (emphasis added).

No such review occurred here, and the VA appears not to have discussed any alternative investigation or sanction.[51]

Ms. Vaught also presented a Table of Penalties that, the Agency admits, had never been previously provided or produced to Dr. Lerner.[52]  Ms. Vaught admitted that the Table did not specifically proscribe the conduct in which Dr. Lerner had allegedly engaged.  She nevertheless explained that the checklist was instructive because "what we attempt to do in Human Resources is, if the charge is not specifically spelled out in the Table of Penalties, we relate it to the most near instances that has [sic] occurred here."[53]  Ms. Vaught analogized Dr. Lerner's conduct to abuse of patients or beneficiaries and abusive or obscene language toward other personnel, two items that appear on the checklist, but that no evidence supports, and that the Agency has never even alleged against Dr. Lerner.[54]

Finally, Ms. Vaught confirmed that she, like everyone else, did not examine any medical charts or patient data, instead accepting all alleged complaints at face value as true "[u]nless we have something to discount them."[55]  Ms. Vaught acknowledged that patients might exaggerate or distort interactions with doctors, but claimed she would not seek evidence from the patients and would

---

[51] *See generally* R. A. 159-69 (pp. 28-68 of hearing transcript) (Ms. Egolf describing her investigation).

[52] *See* R. A. 212 (p. 237 of hearing transcript).

[53] R. A. 212 (pp. 237-38 of hearing transcript).

[54] *See id.*; *see also* R. A. 342-53, Agency Exhibit M-6, Table of Penalties.

[55] R. A. 216-17 (pp. 256-58 of hearing transcript).  Under normal Agency procedures, Ms. Vaught should have completed a form checklist that described all of the evidence, the potential charges, and the ways the charges were justified under Agency policy.  *See* R. A. 351-52, Agency Exhibit M-6, Disciplinary/Adverse Action Checklist.  Here, the record does not contain a completed checklist for any of the matters at bar.

18

instead advise *a supervisor* to do that."[56]   No Agency investigator spoke with any of the patients here, nor did they even review their medical charts or Dr. Lerner's notes.  Instead, all plainly admit that they took the alleged patient complaints at face value.

When the DAB rendered its decision, it expressly rejected three of the charges, including the complaint about the patient with the University of Louisville hat, as well as both complaints arising out of Dr. Lerner's interactions with the investigating personnel.[57]   In addition to finding that Dr. Lerner had not behaved inappropriately in these instances, the DAB took issue with a number of grievous flaws in the Agency's procedures in investigating Dr. Lerner.  The DAB also expressly referenced a number of "mitigating factors" that Mr. Pfeffer had ignored:

> The Board has also determined that there are mitigating factors to consider with regard to the penalty.  The Agency conducted a very inadequate fact finding process prior to laying charges.   The proposing official, the Chief of Surgery, delegated essentially the fact finding to Eva Egolf and admitted that he knew little or nothing about the results of the fact finding.  He relied solely on HR to craft the suspension proposal and it is not clear that he even knew the contents of the letter when he signed it, although he did accept responsibility for the letter.  The Chief of Surgery stated that Ms. Egolf was an unbiased third party.  The Board determined that Ms. Egolf was not an unbiased third party since she reported directly to the Chief of Surgery.  As a result Ms. Egolf was not a good candidate to conduct essentially the entire fact finding process. The Board also determined that the Agency had alternative fact finding mechanisms such as an administrative investigation.[58]

Having discussed the flaws in the factual investigation, the DAB next considered mitigating factors regarding the penalty assessment:

---

[56] R. A. 217 (pp. 259-60 of hearing transcript) (emphasis added).

[57] *See* DAB Board Action dated August 8, 2012, R. A. 11-12.

[58]  DAB Board Action dated August 8, 2012, R. A. 12-13 (internal citations to DAB record omitted).

>The Board further determined that there was significant conflict between the testimony of the Chief of Surgery and the Medical Center Director regarding the role of the Chief of Surgery is issuing the suspension proposal. This conflict undermines the credibility of the Agency with regard to the suspension. Finally the Board determined that there was no evidence that the Agency had offered the appellant any counseling, employee assistance or communication skill training after the admonishment. Although the Agency had no specific responsibility to offer assistance to the appellant, the Agency would have performed due diligence to in [sic] providing a resource for rehabilitating the employee by providing training where there has been a noted deficiency. The Board considered the Agency had a responsibility to offer such assistance and that the failure to do so constitutes a mitigating factor.[59]

"Mitigating factors" was the only Douglas Factor that the DAB chose to discuss with regard to the penalty, giving no attention or evaluation to the remaining eleven.[60]

Despite the serious substantive and procedural objections, the DAB nevertheless sustained three of the six charges, and a reduced five-day suspension. The DAB attributed its decision that a reduced suspension to the allegedly "serious" nature of the offenses, the fact that he had a prior admonishment, and Dr. Lerner's failure to "show[] remorse" for his alleged "wrongdoings." Although the DAB could not unwind the suspension that the VA had already executed without due process, it ordered that Dr. Lerner be retroactively compensated for the portion of the suspension that it found unwarranted.

Federal law required the Disciplinary Appeals Board to render an opinion within forty-five days of the hearing, "and in any event no later than 120 days after the appeal commenced."[61] As the DAB appeal commenced on December 14, 2011, the DAB was required to issue an opinion by

---

[59] DAB Board Action dated August 8, 2012, R. A. 13.

[60] *See generally* DAB Board Action dated August 8, 2012, R. A. 9-13.

[61] 38 U.S.C. § 7462(c)(4).

April 12, 2012.  The same law requires the Under Secretary to finalize the Agency decision within

ninety days of its receipt of the decision.[62]  Despite these clear statutory directives, weeks and

months passed after the hearing without a final decision or any word from the DAB to Dr. Lerner.

Dr. Lerner later learned that the Board formulated its recommendation to the Under Secretary on

April 16, 2012, days after its statutory deadline expired.[63]  Only in August, 2012 did the Under

Secretary issued a final decision adopting the DAB's recommendation – mitigation of the suspension

to five days.[64] This timely appeal followed.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court's review of an administrative agency's action is governed by 38 U.S.C.

§ 7462(f)(2), under which:

> the court shall review the record and hold unlawful and set aside any
> agency action, finding, or conclusion found to be – (A) arbitrary,
> capricious, an abuse of discretion, or otherwise not in accordance
> with law; (B) obtained without procedures required by law, rule, or
> regulation having been followed; or (C) unsupported by substantial
> evidence.[65]

In determining whether an agency's decision is arbitrary and capricious, a reviewing court must

"consider whether the decision is based on a consideration of the relevant factors and whether there

---

[62] 38 U.S.C. § 7462(d)(1).

[63] *See* R. A. 14.

[64] *See* R. A. 6-14.

[65] 38 U.S.C. § 7462(f)(2)

has been a clear error of judgment."[66]    An agency's decision may be considered arbitrary and capricious if:

> 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'[67]

The standard of review under 38 U.S.C. § 462(f)(2) "directly mirrors the standard for judicial review of other administrative actions."[68]

Although this standard is a deferential one, it "does not automatically mandate adherence to a flawed finding.[69] Otherwise stated, the standard "is not . . . without some teeth.'"[70] "'Deferential review is not no review,' and 'deference need not be abject.'"[71] That the Court's review is deferential "does not mean [it] must also be inconsequential," for "federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions."[72]

The "substantial evidence" component of the analysis mandates that an agency's decision will be upheld only "if it is the result of a deliberate principled reasoning process, and if it is

---

[66] *Taylor v. Principi*, 92 Fed. Appx. 274, 276 (6th Cir. 2004) (citing *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1355 (6th Cir. 1994)).

[67] *Id.* at 276-277 (quoting *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 911 (6th Cir. 2000)).

[68] *Rajan v. Principi*, 90 Fed. Appx. 262, 263 n. 1 (9th Cir. 2004) (citing Administrative Procedure Act, 5 U.S.C. § 706(2)).

[69] *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003).

[70] *Id.* (quoting *Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1107-08 (7th Cir. 1998)).

[71] *Id.* (quoting *Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)).

[72] *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005).

supported by substantial evidence."[73]  To determine whether substantial evidence exists, courts "must determine [if] the board considered 'such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached.'"[74]  The requisite quantum is more "'than a mere scintilla . . . .  [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict. . . .'"[75]

The DAB's findings do not meet this standard, largely for the reasons that the DAB itself cited when it held the Agency's investigation to be biased and inadequate.  None of the charges against Dr. Lerner were supported by any evidence, let alone substantial evidence, and the testimony at the DAB hearing instead showed grievous substantive and procedural errors that tainted the investigation and any of its findings.  As discussed below, there was no competent evidence of any violation, and the record is replete with evidence that the VA disregarded its own policies in imposing the suspension.  Accordingly, the entire suspension, and not merely half of it, must be vacated.

## II.    THE VA OFFERED NO DIRECT OR COMPETENT EVIDENCE IN SUPPORT OF ITS DECISION TO SUSPEND DR. LERNER, AND THE EVIDENCE THAT IT DID PRESENT CAME ENTIRELY FROM AN INVESTIGATOR WHOM THE DAB ITSELF CONSIDERED BIASED AND INADEQUATE

In sustaining three of the six charges against Dr. Lerner, the DAB did not address the adequacy of the evidence offered by the Agency in support of the three sustained charges.  Instead, the DAB held it more likely than not that Dr. Lerner had engaged in misconduct or inappropriate

---

[73] *Baker v. United Mine Workers of America Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).

[74] *Taylor*, 92 Fed. Appx. at 277 (quoting *R.P. Carbone Constr. Co. v. Occupational Safety & Health Review Comm'n*, 166 F.3d 815, 818 (6th Cir. 1998)).

[75] *Abequeta v. United States*, 255 F. Supp. 2d 1020, 1024 (D. Ariz. 2003) (quoting *Jackson v. Veterans Admin.*, 768 F.2d 1325, 1329 (Fed. Cir. 1985)).

behavior, despite the absence of any direct evidence.    The evidence does not support this conclusion.  The entirety of the Agency's evidence on these points came from Eva Egolf, an administrative assistant who was delegated the task of finding a basis to discipline Dr. Lerner, and whose boss, Dr. Gaar, admitted bearing a personal animus toward Dr. Lerner that the DAB found should have precluded him from participating in the proceeding.  The DAB never articulated its reasoning behind concluding that Ms. Egolf was similarly biased, but the logical inference is clear and reasonable.

The DAB's case against Dr. Lerner rested on Ms. Egolf's hearsay and hearsay-upon-hearsay, on Dr. Lerner's protestations of innocence rather than admission to "some degree of wrongdoing," and on one admonishment Dr. Lerner received in almost six years of practice at the VA.[76]  The VA did not present any patient testimony or even the testimony of anyone who purported to witness any inappropriate statements.  Instead, the VA relied heavily on Dr. Lerner's refusal to show "remorse" for conduct in which he did not engage, in a process that he correctly viewed as a witch hunt.  Viewing the administrative record as a whole, the DAB failed to proffer even a "scintilla" of evidence to support its decision, let alone "substantial evidence."

In *Stephens v. Derwinski*, the district court reversed the Department of Veterans Affairs' decision to terminate the plaintiff, a nurse, as an arbitrary and capricious action unsupported by substantial evidence.[77]  There, after allegations that two assistant nurses abused a patient, the Department of Veteran Affairs' Disciplinary Board opened an investigation into the plaintiff and her conduct surrounding the incident.    As a result of that inquiry, the Board made two adverse findings against the plaintiff.  First, the Board found that the plaintiff "had tried to 'minimize' the

---

[76] *See* DAB Board Action dated August 8, 2012, R. A. 10, 12.

[77] 790 F. Supp. 29, 31 (D. D.C. 1992).

severity of the abuse following the incident."[78]  Second, the Board determined that the plaintiff "had failed to disclose that [another employee] had reported the incident of abuse to her, in effect hindering the investigation into the abuse."[79]  For these reasons, the Board terminated the plaintiff. She appealed pursuant to the Administrative Procedure Act.

While recognizing that an administrative agency's decision is "due great deference," the district court held the decision "to fire a ten-year employee based upon the equivocal testimony of only one other person strain[ed] such deference beyond its limits."[80]  From the outset, the judge expressed his "grave concern" with regard to the Board's decision.[81]  On one hand, the judge rejected the Board's contention that the plaintiff had tried to minimize the incident.  Rather, the plaintiff's initial report provided the impetus for "further investigation regarding the abuse."[82] Moreover, contrary to the Board's testimony, the plaintiff claimed the employee never approached her with information regarding the alleged abuse.  As the judge summarized, the Board's "finding that [the plaintiff] failed to report [the employee's] conversation with her is based solely on testimony by [the employee] that she told [the plaintiff] about the incident."[83]  That testimony, however, lacked consistency.  In sum, the court found the sanction "simply fail[ed] the 'Doesn't add up' test."[84]

---

[78] *Id.* at 30.

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.* at 31.

"Left with such an inexplicably harsh sanction," the court examined the record for other possible factors that might explain the severity of the Board's sanction.[85]  Upon a closer look, the judge emphasized that the plaintiff was "an active union organizer at the time of [the] incident" and, consequently, the possibility remained that "management" desired to terminate her on the basis of those activities.[86]  The court's suspicion found support in the testimony of a doctor who revealed that his supervisor pressured him to investigate and find the plaintiff guilty of prior, unrelated conduct in an effort to set the stage for her discharge.[87]  Consequently, the judge reversed the Board's decision as arbitrary and capricious, unsupported by substantial evidence.

The evidence that the *Stephens* court found inadequate is veritably mountainous when compared to the evidence here.  All of the evidence suggesting that Dr. Lerner had engaged in any inappropriate conduct came from Eva Egolf, who was not an investigator or a Human Resources expert, but instead the secretary of Dr. Lerner's superior, Dr. Gaar.

Ms. Egolf had conducted serial investigations of Dr. Lerner, all at Dr. Gaar's behest.  The instant investigation arose out of sundry alleged patient complaints, but all of these curiously sprung up in a three-week period immediately after Dr. Lerner brought evidence of severe misconduct to the attention of Dr. Gaar's superiors.  All stood in stark contrast to the thousands of favorable patient encounters that Dr. Lerner had over the preceding years.  Ms. Egolf's purported investigation of these complaints involved no communications with the patients, and only a confrontation with Dr. Lerner, wherein she disregarded his responses.  After this inquiry, Ms. Egolf brought her findings to Facility Director Pfeffer, who accepted all of the complaints.  Mr. Pfeffer assessed a severe

---

[85] *Id.*

[86] *Id.*

[87] *Id.*

26

penalty, and did so only after conferring with Dr. Gaar, who testified that he played no role in the process.  The basis for selecting that penalty was Dr. Lerner's history of contentious interactions with Dr. Gaar, who acknowledged a historical enmity, and who professed to have recused himself from the case on that basis.  The VA then proceeded to summarily enforce the severe suspension without according Dr. Lerner the due process assured by its bylaws, despite the fact that none of his conduct qualified for summary suspension.  As VA's counsel and its Human Resources witness testified, the conduct was not even alleged to be intentional, much less of the sort that would endanger patients or justify a pre-hearing deprivation of Dr. Lerner's rights.[88]  Finally, even the DAB rejected three of the six charges as unfounded.

## III.    THE VA'S EXCLUSIVE RELIANCE ON HEARSAY TESTIMONY DOES NOT CONSTITUTE SUBSTANTIAL EVIDENCE IN SUPPORT OF THE BOARD'S DECISION

All of the evidence to support any of the charges against Dr. Lerner came in the form of hearsay from Ms. Egolf.  Although hearsay is permissible in administrative proceedings, it cannot by itself meet the substantial evidence standard. The United States Supreme Court has expressly held that "a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force.  Mere uncorroborated hearsay or rumor does not constitute substantial evidence."[89]  While the "requirement that the administrative findings accord with the substantial evidence does not forbid administrative utilization of probative hearsay . . . the findings, to be valid, cannot be based upon hearsay alone, nor upon hearsay corroborated by a mere scintilla."[90]

---

[88] *See* R. A. 213 (p. 241 of hearing transcript).

[89] *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 230 (1938).

[90] *Willapoint Oysters v. Ewing*, 174 F.2d 676, 690-91 (9th Cir. 1949).

27

In light of these fundamental concerns, the Sixth Circuit Court of Appeals has articulated a number of factors to determine "whether hearsay evidence constitutes substantial evidence" in the context of an administrative agency's decision.[91] A reviewing court must weigh:

> (1) the independence or possible bias of the declarant, (2) the type of hearsay material submitted, (3) whether the statements are signed and sworn to as opposed to anonymous, oral, or unsworn, (4) whether the statements are contradicted by direct testimony, (5) whether the declarant is available to testify and, if so, (6) whether the party objecting to the hearsay statements subpoenas the declarant, or whether the declarant is unavailable and no other evidence is available, (7) the credibility of the declarant if a witness, or of the witness testifying to the hearsay, and finally, (8) whether the hearsay is corroborated.[92]

Under this analysis, the testimony proffered by Ms. Egolf in support of the charges is patently insufficient to constitute substantial evidence. The only testimony in support of the three charges upheld by the DAB is the Report of Contact, itself hearsay, and Ms. Egolf's recitation of those facts, or hearsay-upon-hearsay.[93] Patients were available and were not even contacted during Ms. Egolf's biased investigation, much less at the hearing.

In reaching its decision with regard to Specification A, the DAB ignored the fact Dr. Lerner denied uttering those statements. Instead, the DAB identified two grounds for finding it "more likely than not" that Dr. Lerner "used this language with respect to the wife and the son" – his past disciplinary record, an underwhelming, single admonition and his alleged "lack of expressed remorse," which the DAB later termed his refusal to "admit[] some degree of wrongdoing," i.e., the

---

[91] *R.P. Carbone Constr. Co.*, 166 F.3d at 819 (citing *Richardson v. Perales*, 402 U.S. 389, 402-406 (1971)); *see also Myers v. Secretary of HHS*, 893 F.2d 840, 845 (6th Cir. 1990) (holding that the multi-factor test applies to agency decisions).

[92] *Id.* (citing *Calhoun v. Bailar*, 626 F.2d 145, 149 (9th Cir. 1980)).

[93] *See* Report of Contact dated June 30, 2011, R. A. 277; DAB Board Action dated August 8, 2012, R. A. 10-12.

fact he maintained his innocence.[94]  When Dr. Lerner requested the VA to produce "[u]nredacted copies of any and all documents that constitute or refer to patient complaints" and sought to call those identified persons as witnesses, the DAB denied his requests and heard no testimony from the complaining patients.[95]

The testimony at the DAB contained not even a scintilla of evidence to support the charges, and the DAB did not find otherwise.  The DAB based its decision solely on Ms. Egolf's recitation of hearsay, notwithstanding the fact that the DAB discredited her as a biased party.[96]  The DAB appeared to reason that while no evidence supported the charges, and Dr. Lerner denied them, his history of conflict with his superiors justified acceptance of the charges and imposition of discipline. This is no evidence, and not substantial evidence, as required by 38 U.S.C. § 7462.

## IV.    THE VA FAILED TO CONDUCT AN ADEQUATE FACT-FINDING IN SUPPORT OF ITS DECISION TO SUSPEND DR. LERNER

The DAB fully recognized that, in this case, the VA "conducted a very inadequate fact finding process prior to laying charges."[97]  Neither the VA nor the DAB offered a scintilla of direct evidence in support the charges against Dr. Lerner.  Inexplicably, however, the DAB sustained three of the six charges against Dr. Lerner.  Consequently, the DAB's decision was arbitrary and capricious, wholly devoid of the "substantial evidence" necessary for this Court to sustain its findings.

---

[94] DAB Board Action dated August 8, 2012, R. A. 10-12.

[95] DAB Response to Motions and Witnesses dated March 1, 2012, R. A. 149-150.

[96] *See* DAB Board Action dated August 8, 2012, R. A. 10, 12.

[97] DAB Board Action dated August 8, 2012, R. A. 12.

From the outset, the DAB criticized the VA for "undermin[ing] the credibility of the Agency with regard to the suspension."[98]  As Dr. Lerner's immediate supervisor, Dr. Gaar instigated the instant disciplinary action against him.  However, as the DAB admitted, numerous procedural and substantive errors riddled the process underlying Dr. Lerner's suspension.

The DAB not only faulted Dr. Gaar for "essentially" delegating the entire fact-finding process to Ms. Egolf, but also for knowing "little to nothing" about its results.[99]  In addition, the DAB faulted Dr. Gaar for selecting Ms. Egolf, who was neither "an unbiased third party" and not "a good candidate to conduct essentially the entire fact finding process."[100]  Following the fact-finding process, Dr. Gaar purported to have "relied solely on [Human Resources] to craft the suspension proposal . . . ."[101]  In fact, as Dr. Gaar testified and the DAB identified, he did not even know "the contents of the letter when he signed it . . . ."[102]  Only after the DAB Chairperson queried Dr. Gaar about his role in the proposed suspension and his own signature on the proposal did Dr. Gaar finally admit that he had, in fact, been responsible for the contents of Ms. Egolf's proposal.[103]

In light of these errors, the DAB admonished the VA for failing to use "alternative fact finding mechanisms such an administrative investigation."[104]  At the DAB hearing, Dr. Becker raised this issue with Director Pfeffer, seeking an explanation as to why the VA pursued disciplinary action

---

[98] DAB Board Action dated August 8, 2012, R. A. 13.

[99] *See* DAB Board Action dated August 8, 2012, R. A. 12.

[100] DAB Board Action dated August 8, 2012, R. A. 12-13.

[101] DAB Board Action dated August 8, 2012, R. A. 12.

[102] *See* DAB Board Action dated August 8, 2012, R. A. 12.

[103] *See* R. A. 198 (pp. 183-184 hearing transcript).

[104] DAB Board Action dated August 8, 2012, R. A. 13.

through a fact-finding process rather than an administrative investigation in which witnesses "would have been called[.]"[105] Director Pfeffer indicated that he had given the matter some "thought," but that he did not think Dr. Lerner's "misconduct [was] egregious enough . . . [to] warrant" an administrative investigation.[106] Conversely, however, Mr. Pfeffer believed that charges to be egregious enough to merit the suspension of a physician with a history of thousands of patient interaction, none of which had yielded complaints.

As the DAB recognized in its decision, Director Pfeffer directly contradicted Dr. Gaar's testimony.[107] While Dr. Gaar claimed he "relegated" the whole investigation to Ms. Egolf and had "essentially" nothing to do with the process,[108] Director Pfeffer testified at length that he not only "met with Dr. Gaar," but that Dr. Gaar and he "went through each of the charges," the "rationale," and the supporting "documentation" and that Dr. Gaar expressed his view that the charges were "sustainable[.] "[109]   Director Pfeffer conceded that Dr. Gaar "participated actively" in the disciplinary process.[110] Dr. Lerner need not devote great energy to establishing Dr. Gaar's personal bias, because Dr. Gaar candidly admitted that bias in his testimony.

## V.    THE DAB OPINION AND THE SECRETARY'S DECISION ARE UNLAWFUL AS TIME-BARRED

---

[105] R. A. 209 (p. 226 hearing transcript).

[106] R. A. 209 (pp. 226-227 hearing transcript).

[107] *See* DAB Board Action dated August 8, 2012, R. A. 13.

[108] *See* R. A. 190-191 (pp. 152-153 of hearing transcript).

[109] R. A. 203 (pp. 201-202 hearing transcript).

[110] R. A. 203 (p. 202 hearing transcript).

Under codified law, the DAB was required to render an opinion within 120 days of the appeal's commencement, and the Secretary was required to issue its decision within 90 days of its receipt of the Agency decision. Federal law requires that "the Secretary shall cause to be executed the decision of the Disciplinary Appeals Board in a timely manner *and in any event not more than 90 days after the decision of the Board is received by the Secretary*."[111] Timely action is key, as "[t]he Secretary's execution of a board's decision shall be the final administrative action in the case."[112] From the administrative record in this case, it is clear that the DAB rendered its opinion and delivered it to the Under Secretary on April 16, 2012, days after its statutory deadline.[113] The "not more than 90 days" requirement, therefore, would have required a final action by the Secretary by July 15, 2012. Instead, the Secretary's action approving the DAB decision is dated August 10, 2012 – almost a month later.[114]

Federal law is clear that agency inaction, in the face of clearly prescribed statutory timelines, is not a replacement for a decision.[115] Agencies are not permitted to shirk their clear statutory duties. "[C]lear duties to act include provisions that require an agency to take specific action when certain preconditions have been met."[116] Here, the Secretary had an express duty to take action – if such action was to include adopting the DAB decision – "in any event not more than 90 days" from the

---

[111] 38 U.S.C. § 7462(d)(1) (emphasis added).

[112] 38 U.S.C. § 7462(d)(4).

[113] R. A. 14.

[114] R. A. 6.

[115] *See Sierra Club v. Thomas*, 828 F.2d 783, 792-93 (D.C. Cir. 1987).

[116] *Id.* at 793 (citing *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 593–95 (D.C. Cir. 1971)).

time it received the DAB decision.  The administrative record contains no evidence of circumstances creating an unforeseen delay, nor does it contain any notification to Dr. Lerner that additional time was desired.  Instead, the DAB and the Secretary simply violated the clear statutory duties set forth in 38 U.S.C. § 7462.  This presents a final and alternative basis for the vacatur of the DAB's ruling.

<u>**CONCLUSION**</u>

The Veterans Administration's investigation into Dr. Lerner's alleged inappropriate conduct suffered from grievous substantive and procedural flaws, as the DAB was constrained to observe. Dr. Lerner's direct superior, with whom he had a documented history of conflict, delegated the task of investigating and punishing Dr. Lerner to an administrative assistant who was neither qualified not objective.  Having been directed to find fault with Dr. Lerner, Eva Egolf complied, generating and substantiating no fewer than six charges in a three-week period.  All of the charges were based on what were at best subjective complaints, none of which Ms. Egolf fully or properly investigated before turning the matter over to her superiors to impose a penalty.  Dr. Lerner denied the substantive allegations, and his denials remain the only competent evidence of record concerning the charged conduct.

The evidence presented before the DAB showed that the penalty stage of the discipline was equally deficient. The VA imposed a summary suspension, despite the fact that Dr. Lerner's alleged conduct did not merit such a deprivation of due process.  As the DAB recognized, the impetus behind the imposition of this severe discipline plainly emanated from Dr. Gaar, despite his protestations of non-involvement.  The sole basis for the DAB to have affirmed any of the charges was Dr. Lerner's unwillingness to admit remorse or contrition for acts that were not wrong.  This is not evidence at all, let alone substantial evidence, and for these reasons, Dr. Lerner respectfully requests that this Court reverse and vacate the suspension in its entirety.

33

Respectfully submitted,


/s/ Glenn A. Cohen
GLENN A. COHEN
PAUL HERSHBERG
ROBYN SMITH
SEILLER WATERMAN LLC
462 S. Fourth Street, 22nd Floor
Louisville, Kentucky  40202
Telephone:  (502) 584-7400
Facsimile:  (502) 583-2100
E-mail:  gcohen@derbycitylaw.com
E-mail:  hershberg@derbycitylaw.com
E-mail:  rsmith@derbycitylaw.com
Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 21, 2013, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Benjamin Seth Schecter, Esq.
ben.schecter@usdoj.gov

Michael D. Ekman, Esq.
michael.ekman@usdoj.gov

I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the following non-CM/ECF participants:

[none]

/s/ GLENN A. COHEN
GLENN A. COHEN
PAUL HERSHBERG
ROBYN SMITH

G:\doc\GAC\Lerner\Pldgs\WDKY\Brief 062113.wpd

35