UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:12-CV-00565


GUY M. LERNER                                                    Plaintiff

v.

ERIC K. SHINSEKI, *et al.*                                      Defendant


## MEMORANDUM OPINION

This action is brought pursuant to 38 U.S.C. § 7462(f) for judicial review of the final decision of the Disciplinary Appeals Board relative to the suspension issued against the Plaintiff, Guy M. Lerner, M.D.  Plaintiff has submitted his brief, (Docket No. 31), the Defendant, the United States Department of Veterans Affairs, has responded, (Docket No. 32), and Plaintiff has replied, (Docket No. 33).  This matter is now ripe for adjudication.  For the reasons that follow, the Court will set aside the decision of the Disciplinary Appeals Board and vacate the penalty imposed.


## BACKGROUND

Plaintiff Guy Lerner (Lerner) is a Kentucky-licensed physician employed by the Department of Veterans Affairs (VA) pursuant to 38 U.S.C. § 7401(1) as a full-time permanent physician at the Robley Rex Veterans Administration Medical Center (VAMC) in Louisville, Kentucky.  In his Complaint, Lerner named as defendants the VA as well as Edwin Earl Gaar, III, M.D. (Gaar), the VAMC's Chief of Surgery; Wayne L. Pfeffer (Pfeffer), the VAMC's Medical Center Director; Eva M. Egolf (Egolf), who serves as a patient advocate at VAMC and an administrative assistant to Gaar; Christy

A. Rowzee, a supervisory human resources specialist at the VAMC; and Jennifer Vaught (Vaught), a human resources specialist at the VAMC. In its April 26, 2013, Memorandum Opinion and Order, the Court dismissed each of Lerner's nine numbered claims against the individual named Defendants; however, the Court concluded that Lerner's appeal of the Disciplinary Appeals Board's (DAB) decision was properly before the Court, reasoning:

> VA physicians, such as Lerner, are afforded procedural protections when they experience a "major adverse action" as defined by 38 U.S.C. § 7461. A suspension qualifies as a major adverse action. *Id.* § 7461(c)(2)(B). Further, the major adverse action was the result of "professional conduct or competence." *Id.* § 7461(c)(3); (Docket No. 1-1, at 2 ("The action being appealed is a major adverse action. The charge upon which the action is based, in whole or in part, involves an issue of professional conduct and competence . . . ."). Adverse actions involving professional conduct or competence are governed by § 7462, which provides for judicial review. Thus, Lerner's appeal of the DAB decision is properly before this Court for review.

(Docket No. 28.)

Lerner began his employment at the VAMC in early 2007. On February 7, 2011, Gaar issued a notice of proposed reprimand to Lerner for (1) failure to follow instructions and (2) inappropriate conduct. (Admin. R. at 335.) The first reason, referred to as "Charge I," related to Lerner's failure to properly label syringes, inappropriate completion of post-procedure notes prior to the completion of the procedure,[1] and failure to follow proper hand-washing procedures. (*See* Admin. R. at

---

[1] The February 7, 2011, notice of proposed reprimand appears to refer to Lerner's alleged inappropriately completing post-procedure notes prior to the completion of the procedure as falling under Charge II, "Inappropriate Conduct"; however, the VA, in its brief, appear to refer to these allegations as

335.)  These alleged infractions, according to the notice of proposed reprimand, occurred on four dates between February 2010 and June 2010.  (Admin. R. at 335.)  The second reason, referred to as "Charge II," related to Lerner's alleged inappropriate conduct toward a patient on July 16, 2010.  (Admin. R. at 335.)  The "specification" in support of Charge II stated:  "Specifically, when the patient began to exhibit disruptive behavior towards you while in clinic, you became increasingly angry and the patient reported you called him an 'idiot.'  You admitted calling him a 'clown.'  Both words are unacceptable and your conduct was inappropriate."  (Admin. R. at 335-36.)  Lerner provided a written reply to the notice of proposed reprimand on February 25, 2011, insisting that the charges were without merit.  (Admin. R. at 110-12.)  Lerner further argued that "most of the specified charges occurred almost one year ago and the issues, while extremely minor in nature, were immediately addressed and corrected."  (Admin. R. at 110.)  Lerner's union representative, Sandra Richardson (Richardson), also submitted further information on Lerner's behalf.  (*See* Admin. R. at 337.)

On April 13, 2011, Marylee Rothschild, M.D. (Rothschild), Chief of Staff at the VAMC, reduced the proposed reprimand to an admonishment.  (Admin. R. at 337-39.)  Rothschild noted that she had reviewed Lerner's work for the period of February 28 through March 3, 2011, and "found complete pre and post medical procedure notes in a timely manner."  (Admin. R. at 337.)  Rothschild also noted that "during an unannounced accreditation readiness review on March 23, 2011, it was shown that the appropriate hand washing was done prior to donning sterile gloves."  (Admin. R. at 337.)  Rothschild commented, however, that "during the same review, it was noted that

falling under Charge I, "Failure to Follow Instructions."  (*Compare* Admin. R. at 335, *with* Docket No. 32, at 2-3.)

identification of the medication used was still not in compliance."  (Admin. R. at 337.)

Rothschild concluded:

> Last, it is my expectation that you maintain professionalism during any and all interactions with patients.  Failure to do so disrupts continuity of care and negatively impacts a patient's perception of the care being provided.  Although you reportedly provided additional care to this patient in later productive encounters, the initial interaction was quite unfortunate.  This patient encounter contributed to my determination of an admonishment.

(Admin. R. at 337.)

Thereafter, on June 16, 2011, a *Weingarten*[2] fact-finding meeting was conducted by Egolf, Gaar's administrative assistant.  (*See* Admin. R. at 278-86.)  Present at that meeting were Egolf, Lerner, and Richardson, Lerner's union representative.   In her report of that meeting, Egolf wrote:  "I began the meeting by stating that I had been given authority by Dr. Gaar to conduct the Fact Finding review.  Sandy Richardson asked what the 'charges' were; I noted we would be asking questions about the following: 'time out' process, medication vials, May 13, 2011 incident – interaction with nurse practitioner, and alleged blogging."  (Admin. R. at 278.)  Apparently, no formal charges or other disciplinary action came about as a result of that meeting.  (*See* Docket No. 31, at 5.)

Another *Weingarten* meeting was conducted by Egolf on July 13, 2011. (Admin. R. at 267-74.)  By this point, Gaar apparently had delegated to Egolf the

---

[2] A "Weingarten meeting" refers to the Supreme Court's decision in *N.L.R.B. v. J. Weingarten, Inc.*, 420 U.S. 251 (1975), a case in which the Court held that union employees were entitled to "the right to insist on the presence of a union representative at an investigatory interview with employer personnel which he reasonably believes will result in disciplinary action."  *Spartan Stores, Inc. v. N.L.R.B.*, 628 F.2d 953, 957 (6th Cir. 1980).

authority to conduct an investigation and fact finding relative to Lerner. (Admin. R. at 160 (Hr'g Tr. at 29).) The July 13 meeting addressed several interactions among Lerner and his patients during the two-week period of June 23 through July 7, 2011. The first encounter occurred between Lerner and "Patient A" on June 23[3], 2011. (Admin. R. at 267.) According to Egolf's notes, Patient A stated that Lerner asked him "something to the effect of 'are you a real UofL' fan and then made some comment about they couldn't get anyone into the MBA." [4] (Admin. R. at 290.) The second encounter occurred on June 29, 2011 among Lerner, "Patient B," Patient B's wife, and Patient B's son, all of whom are African American. (Admin. R. at 269.) According to Egolf's notes, Patient B stated that Lerner called Patient B's wife a "dummy," referred to Patient B's son as a "big gorilla," and, when Patient B's wife asked questions about Patient B's treatment, Lerner responded, "who's the patient here?" (Admin. R. at 277.) The third encounter occurred between Lerner and "Patient C" on July 7, 2011. (Admin. R. at 272.) According to a note transmitted to Egolf by Patrice Gordon, R.N. (Gordon), Patient C stated "that Dr. Lerner told him to call the surgery department and complain." (Admin. R. at 275.) Gordon's note also reflected that Patient C "stated that Dr. Lerner told him that the surgery dept is trying to get rid of him." (Admin. R. at 275.) The record reflects that Egolf spoke directly with Patient A and Patient B, (*see* Admin. R. at 277, 288), but Egolf did not speak directly with Patient C, (*see* Admin. R. at 160 (Hr'g Tr. at 31)).

---

[3] Egolf's *Weingarten* meeting notes reflect that this encounter occurred on June 23, (Admin. R. at 267); however, her report of her telephone conversation with Patient A inconsistently reflects that the encounter occurred on June 22, (Admin. R. at 290).

[4] Although both Egolf's *Weingarten* meeting notes and report of her telephone conversation refer to the "MBA," presumably both are intended to refer to the "NBA."

By letter of September 29, 2011, Gaar informed Lerner that he was proposing a ten-day suspension based on six instances of alleged inappropriate conduct, which were labeled as "Specifications" A through F.  (Admin. R. 34-36.)  Specification A related to Lerner's encounter with Patient B in which Lerner allegedly called Patient B's wife a "dummy" and referred to his son as a "big gorilla."  (Admin. R. at 34.)  Specification B also related to Lerner's encounter with Patient B, specifically Lerner's alleged statement "who's the patient here?" to Patient B's wife.  (Admin. R. at 34.)  Specification C related to Lerner's encounter with Patient C and Lerner's alleged statements "the nurse quit" and "the surgery department is trying to get rid of me."  (Admin. R. at 34.)  Specification D related to Lerner's interaction with Patient A and Lerner's alleged comments about whether Patient A was "a real U of L fan."  (Admin. R. at 35.)  Specification E appears to relate to Lerner raising his voice to Egolf during the June 16 *Weingarten* meeting when questioned about his "blogging" activities while at work.  (Admin. R. at 35; *see* Admin. R. at 282-83.)   Specification F relates to Lerner's demeanor at the July 13 *Weingarten* meeting, specifically (1) Lerner's having laughed when questioned whether he notified the staff when he leaves the work area, and (2) Lerner's comments to the *Weingarten* meeting reporter that she should "not be taking personal calls, or words to that effect," during the *Weingarten* meeting.  (Admin. R. at 35; *see* Admin. R. at 274.)  Gaar's letter concluded, stating: "I consider these incidents to be very serious . . . and I consider this professional misconduct to be completely unacceptable."  (Admin. R. at 35.)

Gaar's proposal of suspension was then transmitted to Pfeffer, the director of the VAMC, for a final decision.  (*See* Admin. R. at 36.)  On October 21, 2011, Lerner

submitted to Pfeffer a written reply to the proposed suspension. (Admin. R. at 37-38.) Lerner maintained that all of the charges relative to interactions with patients "were taken out of context or simply untrue" and that the allegations against him "have no merit, no bearing on patient care, and have only served the purpose to harass [him]." (Admin. R. at 37.) Lerner further insisted that "[t]he temporal nature and escalating quality of these allegations are clearly retaliatory as they occurred exactly one day to the date that Dr. Gaar's superiors were notified of possible violations of resident physician supervision." (Admin. R. at 37.) Lerner met with Pfeffer on November 2, 2011 to discuss Gaar's proposed suspension. Then, on November 21, Pfeffer sustained Gaar's recommendation and issued a ten-day suspension to Lerner. (Admin. R. at 39-40.)

By letter of December 6, 2011, Lerner invoked his right to a hearing before the DAB. (Admin. R. at 41-42.) Lerner again stated that the charges were without merit and were "based on obscure trivial matters, most of which are untrue or taken out of context." (Admin. R. at 41.) In January 2012, while his appeal was pending, Lerner was required to serve his ten-day suspension.

The DAB conducted a two-day hearing on March 13 and 14, 2012.[5] (*See* Admin. R. at 153-246.) The DAB heard from eleven witnesses, including Egolf, Gaar, Pfeffer, Vaught, Gordon, and Lerner. (*See* Admin. R. at 153 (Hr'g Tr. at 3).) None of the complaining patients or other individuals referenced in Specifications A through D testified. The DAB rendered its decision and submitted its recommendation to the

---

[5] It is not entirely clear whether the hearing was held on March 12 and 13 or March 13 and 14. The VA identifies March 13-14, (Docket No. 32, at 8), whereas Lerner says March 12-13, (Docket No. 31, at 13). The official transcript seems to indicate March 13-14, (*see* Admin. R. at 153, 209); however, the transcript also refers to "March 128," which could be construed as a typo intending to refer to "March 12," (Admin. R. at 153 (Hr'g Tr. at 2)).

Under Secretary on April 16, 2012. (Admin. R. at 14.) In a roughly three-and-one-half page written decision, the DAB sustained three of the six Specifications and, concluding that the ten-day suspension was excessive, reduced the penalty to a five-day suspension. (*See* Admin. R. at 10, 14.) Specifically, the DAB sustained Specifications A, B, and C, but did not sustain Specifications D, E, or F.

In regard to Specification A, the DAB concluded that "the weight of the evidence favored the conclusion that [Lerner] had used the word 'dummy' with respect to the patient's wife and had used the words 'big gorilla' with respect to the patient's son." (Admin. R. at 10.) The DAB noted that Lerner did not remember the encounter and denied using the word "dummy" in the context alleged; however, the DAB reasoned that "given [Lerner's] past disciplinary record and lack of expressed remorse during the hearing . . . it was more likely than not that [Lerner] had used this language with respect to the patient's wife and son." (Admin. R. at 10.)

In regard to Specification B, the DAB found that the weight of the evidence was sufficient to sustain the charge that Lerner used the language "who's the patient here," language which the DAB found was "demeaning and inappropriate." (Admin. R. at 10.) The DAB noted that Lerner did not remember the encounter and testified that if he had used that language, it was to redirect the dialogue back to the patient. The DAB further acknowledged that circumstances where family members intrude on the physician-patient dialogue "do occur regularly," but concluded that "there are far better alternatives to the approach used by [Lerner]." (Admin R. at 10.)

In regard to Specification C, the DAB wrote: "[Lerner] indicated that he did not specifically remember this encounter but testified that it was unlikely that he used the language 'the nurse quit' or 'the surgery department is trying to get rid of me' to a patient. The Board noted that the appellant testified on multiple occasions that he had little control over the pain department, that he lacked space and resources and that the nurse practitioner had quit and was not replaced, substantially increasing [Lerner's] workload." (Admin. R. at 11 (internal citations omitted).) The DAB then concluded: "Given [Lerner's] past record and also his demeanor during the hearing the Board determined that the weight of the evidence supported the charge th[at] [Lerner] had used this language during the patient encounter and that the language constituted Inappropriate Conduct." (Admin. R. at 11.)

Then, under the heading "Penalty," the DAB began by stating that it found the three sustained Specifications "to be serious and warrant discipline." (Admin. R. at 12.) The DAB noted that Lerner had previously received an admonishment and that Lerner "has not shown remorse or admitted to some degree of wrongdoing." (Admin. R. at 12.) The DAB went on to state that there were mitigating factors to be considered:

> The Agency conducted a very inadequate fact finding process prior to laying charges. The proposing official, the Chief of Surgery, delegated essentially the fact finding to Eva Egolf and admitted that he knew little or nothing about the results of the fact finding. He relied solely on HR to craft the suspension proposal and it is not clear that he even knew the contents of the letter when he signed it . . . . The Chief of Surgery stated that Ms. Egolf was an unbiased third party. The Board determined that Ms[.] Egolf was not an unbiased third party since she reported directly to the Chief of Surgery. As a result Ms[.] Egolf was not a good candidate to conduct essentially the entire the fact finding process. The Board

also determined that the Agency had alternative fact finding mechanisms such as an administrative investigation. The Board further determined that there was significant conflict between the testimony of the Chief of Surgery and the Medical Center Director regarding the role of the Chief of Surgery in issuing the suspension proposal. This conflict undermines the credibility of the Agency with regard to the suspension. Finally the Board determined that there was no evidence that the Agency had offered [Lerner] any counseling, employee assistance or communication skills training after the admonishment. . . . The Board considered the Agency had a responsibility to offer such and that the failure to do so constitutes a mitigating factor.

(Admin. R. at 12-13.)

The Under Secretary issued his final decision adopting the DAB's recommendation some four months later on August 10, 2012. (Admin. R. at 6, 14.) This appeal followed.

## STANDARD

The Court's review of the DAB's final action is governed by 38 U.S.C. § 7462(f)(2), which provides:

In any case in which judicial review is sought under this subsection, the court shall review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be--

(A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)     obtained without procedures required by law, rule, or regulation having been followed; or

(C)     unsupported by substantial evidence.

The standard of review under § 7462(f)(2) "directly mirrors the standard for judicial review of other administrative actions." *Rajan v. Principi*, 90 F. App'x 262, 263 n.1 (9th Cir. 2004) (citing 5 U.S.C. § 706(2)).

For purposes of § 7462(f)(A), an agency's decision is "arbitrary and capricious" if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Taylor v. Principi*, 92 F. App'x 274, 276-77 (6th Cir. 2004) (quoting *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 911 (6th Cir. 2000)). "Although the court may not supply a reasoned basis for the agency's action that the agency itself has not given, a decision of less than ideal clarity should be upheld if the agency's path may reasonably be discerned." *Id.* at 277 (citing *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1355 (6th Cir. 1994)). Stated differently, "[t]he arbitrary and capricious standard . . . is met when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Admin. Comm. of the Sea Ray Emps.' Stock Ownership & Profit Sharing Plan v. Robinson*, 164 F.3d 981, 989 (6th Cir. 1999) (citation and internal quotation marks omitted). "Consequently, a decision will be upheld if it is the result of a deliberate principled reasoning process . . . ." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (citation and internal quotation marks omitted). And while this standard of review is "highly deferential," it "does not automatically mandate adherence to [an agency's decision]"—that is, it is not "without some teeth." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (citation omitted). "Deferential review

is not no review, and deference need not be abject." *Id.* (citations omitted) (internal quotation marks omitted). Put another way, "federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005).

Under § 7462(f)(C), the Court also may set aside any agency action unsupported by substantial evidence. "To determine whether the board's findings are supported by substantial evidence, the court must determine whether the board considered 'such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached.'" *Taylor*, 92 F. App'x at 277 (quoting *R.P. Carbone Constr. Co. v. Occupational Safety & Health Review Comm'n*, 166 F.3d 815, 818 (6th Cir. 1998)). "Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence." *R.P. Carbone*, 166 F.3d at 818. In other words, it "must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 111 (6th Cir. 2010) (internal quotation marks omitted) (quoting *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 840 (6th Cir. 1986)). The Court must affirm the agency's decision if it is supported by substantial evidence, even if the Court would have decided the issue differently. *Taylor*, 92 F. App'x at 277 (citing *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993)).

Finally, the Court notes that "relevant and material hearsay may constitute substantial evidence." *R.P. Carbone*, 166 F.3d at 819. However, "[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence." *Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 230 (1938). When deciding whether

hearsay testimony constitutes substantial evidence, the Sixth Circuit, in applying *Richardson v. Perales*, 402 U.S. 389 (1971), advises that courts must consider the following eight factors:

> (1) the independence or possible bias of the declarant, (2) the type of hearsay material submitted, (3) whether the statements are signed and sworn to as opposed to anonymous, oral, or unsworn, (4) whether the statements are contradicted by direct testimony, (5) whether the declarant is available to testify and, if so, (6) whether the party objecting to the hearsay statements subpoenas the declarant, or whether the declarant is unavailable and no other evidence is available, (7) the credibility of the declarant if a witness, or of the witness testifying to the hearsay, and finally, (8) whether the hearsay is corroborated.

*R.P. Carbone*, 166 F.3d at 819.

## DISCUSSION

VA physicians, such as Lerner, are afforded procedural protections when they experience a "major adverse action" as defined by 38 U.S.C. § 7461. A suspension qualifies as a major adverse action. *Id.* § 7461(c)(2)(B). Further, the major adverse action was the result of "professional conduct or competence." *Id.* § 7461(c)(3); (Docket No. 1-1, at 2 ("The action being appealed is a major adverse action. The charge upon which the action is based, in whole or in part, involves an issue of professional conduct and competence . . . ."). Adverse actions involving professional conduct or competence are governed by § 7462, which provides for judicial review. Thus, Lerner's appeal is properly before this Court for review.

Lerner challenges the DAB's decision as (1) arbitrary and capricious, (2) not supported by substantial evidence, and (3) contrary to due process. Because the Court

finds Lerner's first two challenges dispositive of this appeal, the Court need not address in his arguments relative to due process.

## I.     Substantial Evidence

Lerner chiefly argues that the DAB's decision was not supported by substantial evidence. Accordingly, the Court will begin its discussion there. As noted above "[s]ubstantial evidence is more than a scintilla, but less than a preponderance, of the evidence." *R.P. Carbone*, 166 F.3d at 818. "It is such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached," *id.*, and "must be enough to justify, if the trial were to a jury, a refusal to direct a verdict," *Payne*, 402 F. App'x at 111. Lerner insists that all of the evidence to support any of the charges against him came in the form of hearsay from Egolf. Lerner argues that such evidence, particularly in light of the DAB's finding that Egolf was biased and not a good candidate to conduct the fact-finding process, is insufficient to constitute substantial evidence.

### A.     Specification A

In regard to Specification A, the question before the Court is whether the DAB's conclusions that Lerner used the terms "dummy" in reference to a patient's wife and "gorilla" or "big gorilla" in reference to a patient's son, and that the use of those terms constituted inappropriate conduct are supported by substantial evidence. The DAB's written opinion opens its discussion of Specification A with the line "[a]fter hearing testimony and reviewing the evidence"; however, the DAB did not identify what particular testimony or evidence its conclusions are based upon. The only specific mention made is to Lerner's "past disciplinary record" and his "lack of expressed

remorse during the hearing regarding the use of the terms dummy and gorilla." (Admin. R. at 10.) Assuming the DAB's decision was solely based on Lerner's disciplinary record and lack of remorse at the hearing, that decision certainly was not based on substantial evidence. In fact, neither of those considerations has any direct bearing on the question whether Lerner used those terms or whether his doing so constituted inappropriate conduct.

But, regardless of the DAB's stated reasons for reaching its conclusion, the Court, must affirm the DAB's decision if it is "supported by substantial evidence on the record considered as a whole." *R.P. Carbone*, 166 F.3d at 818 (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974)). The VA sets out separate lists of evidence that it says support the DAB's findings that "Lerner called the wife of a patient a 'dummy'" and that "Lerner told an African-American patient that his son was a 'Big Gorilla.'" (Docket No. 32, at 11-15.) The Court will consider each in turn.

**1.      The DAB's determination that Lerner called a patient's wife a "dummy" is not supported by substantial evidence.**

The VA points to nine pieces of evidence as supporting the DAB's finding that Lerner called the wife of a patient a "dummy." That evidence can be summarized as follows:

> (1)   Egolf's "Report of Contact" in which she documented her conversation with the patient and the patient's wife. Egolf's report states that the patient told Egolf that Lerner "called my wife a dummy" and "told him something to the effect that . . . his son was a 'big gorilla.'" Egolf's report also states that the patient's wife told Egolf that Lerner "said something about 'you dummy.'" (Admin. R. at 277.)

(2)    An email sent from nurse Margaret "Peggy" Scully (Scully) to nurse Debra Hunt (Hunt) on June 30, 2011, which was then forwarded to Egolf on July 1, 2011. In this email, Scully states that she "was across the hall in the Pain Clinic doing paperwork" when she "heard Dr. Lerner say 'you dummy.'" She goes on to say, "but I don't know what the context of the conversation was. . . . [The patient] did not seem upset at that time [and] he did not make any complaints at that time." (Admin. R. at 276.)

(3)    Egolf's notes from the *Weingarten* meeting held on July 13, 2011. Egolf's notes reflect that Lerner denied calling the patient's wife a "dummy" and did not remember the specific conversation. Egolf's notes also reflect that Lerner stated it was possible he had used the word but denied he would have used it in the context of calling a patient's family member a "dummy." (Admin. R. at 270.)

(4)    Egolf's testimony before the DAB in which Egolf recounted her conversation with the patient's wife. There, Egolf testified: "I also spoke with the wife and she had asked some questions about the pain medication . . . however, at one point Dr. Lerner . . . must have said something about her being, calling her a dummy, because she said to me, I said to him, I know you just didn't call me a dummy." (Admin. R. at 162 (Hr'g Tr. at 39).)

(5)    Egolf's testimony before the DAB in which Egolf read her notes from the *Weingarten* meeting held on July 13, 2011. Egolf testified that Lerner denied calling the patient's wife a "dummy." Egolf further testified that: "Dr. Lerner stated that sometimes he does use that phrase, but it has to be used in the correct context. He stated . . . he did not say you are stupid or a dummy. He stated he did not recall the interaction." (Admin. R. at 164 (Hr'g Tr. at 46).)

(6)    Egolf's testimony before the DAB about a previous incident in which Lerner called a patient a "clown" (the same incident that resulted in the April 13, 2011, admonishment issued by Rothschild). There, Egolf testified:

Q.   . . . Other than this – this incident, this exchange where the patient accused Dr. Lerner of calling her a dummy, have you

ever heard from any source whatsoever that he has ever spoken to a patient like that?

A. Yes.

Q. Tell me about that.

A. He had a previous incident where he called a patient a clown.

. . . .

Q. Okay. Can you tell me, what was your involvement with this interaction?

A. Actually was not involved with this interaction. I became aware of it when one of the patient advocates from the first floor, I believe, was the one that was called by the main hospital patient advocate. This patient had gone to see Gayle O'Bannon, and reported this complaint that he had been called an idiot.

(Admin. R. at 167-68 (Hr'g Tr. at 60, 63).)

(7) Egolf's testimony before the DAB in which she stated: "I think that's very unprofessional to call any of our patients any kind of names in a joking manner or anytime, I think that's very inappropriate. We're here to serve our Veteran patients, we're not here to call them names." (Admin. R. at 169 (Hr'g Tr. at 66).)

(8) Nurse Scully's testimony before the DAB in which she testified about her June 30 email to Hunt. There, Scully stated: "I didn't hear everything that they were saying, but you could hear some of the conversation. I said that I did hear Dr. Lerner say dummy and I didn't know if he, I assumed he was talking to the patient, but the patient at the time didn't appear to be upset, so, I just thought that was that." When pressed on cross-examination, Scully acknowledged that she did not actually see the patient or his wife because of her location across the hall, clarifying that she "didn't hear any response from them that sounded upset." (Admin. R. at 170 (Hr'g Tr. at 71-72).)

(9)   Pfeffer's testimony before the DAB in which he testified about a meeting with Lerner and Lerner's refusal to discuss specifics with him.  (Admin. R. at 201 (Hr'g Tr. at 195).)

Upon considering the evidence cited by the VA and the record as a whole, the Court finds that the DAB's determination that Lerner "had used the word 'dummy' with respect to the patient's wife . . . and that the use of this language constituted Inappropriate Conduct" is not supported by substantial evidence.

Egolf's Report of Contact, *Weingarten* meeting notes, and testimony before the DAB (numbers (1), (3), (4), and (5) above) all appear to be hearsay evidence of what the patient and his wife told Egolf Lerner had said to them.  Applying the eight factors laid out in *R.P. Carbone*, 166 F.3d at 819, the Court finds that this hearsay evidence does not constitute substantial evidence.  The patient's and his wife's statements that Lerner called the patient's wife a dummy were not signed, sworn, or otherwise verified, and, to the extent they allege Lerner called the patient's wife a "dummy" as opposed to merely using that word in another context, are contradicted by Lerner's sworn testimony before the DAB.  Moreover, it appears that Lerner sought to discover the identities of the complaining patients for the purpose of calling these individuals as witnesses at the DAB Hearing.  (*See* Admin. R. at 24, 28-29; Docket No. 31, at 29; Docket No. 33, at 5.) In a written memorandum following the prehearing conference, the DAB denied this request without explanation.  (*See* Admin. R. at 149.)  There is no indication in the record that either the patient or his wife were unavailable to testify.  The only corroborating evidence appears to be Scully's statement that she heard Lerner say "you dummy."  However, Scully admitted she was across the hall and did not hear the context of the conversation.  She also, inconsistent with her previous statements, admitted at the

hearing that she only heard Lerner say "dummy" (rather than "you dummy") and did not actually see the patient or his wife. Finally, and perhaps most importantly, the DAB expressly determined that Egolf was not unbiased and was not a good candidate to conduct the fact-finding process.[6] Therefore, to the extent the DAB relied upon Egolf's Report of Contact, *Weingarten* meeting notes, and testimony before the DAB, its conclusion that Lerner "had used the 'word dummy' with respect to the patient's wife" is not supported by substantial evidence.

Egolf's testimony about Lerner previously calling a patient a "clown" (number (6) above), aside from being questionably relevant, is similarly hearsay and does not amount to substantial evidence in support of the DAB's decision. In fact, Egolf expressly testified that she had no involvement with that incident. Furthermore, Egolf's opinions about what generally is or isn't professional behavior (number (7) above) has no bearing whatsoever on the question before the DAB, and, thus, also does not constitute substantial evidence.

Scully's email and testimony (numbers (2) and (8) above) similarly do not constitute substantial evidence in support of the DAB's decision to sustain Specification A. The DAB did not make an express determination as to Scully's credibility. Since the DAB did make such a determination relative to Egolf, the Court assumes that the DAB took no issue with Scully's credibility. However, even affording deference to the presumed determination that Scully was credible, Scully's equivocal

---

[6] Even assuming this evidence were not hearsay, Egolf's bias renders it of little or no value to substantiate the charges against Lerner. The DAB expressly found that Egolf was biased and should not have been delegated the responsibility of investigating Lerner. Moreover, Egolf's bias is plainly apparent on even a cursory review of the administrative record. The DAB at no point states that its decision was based on this evidence, and, in light of its criticism of Egolf, it is difficult to imagine that the DAB would have given any significant weight (or any weight at all) to Egolf's reports and testimony.

email ("but I don't know what the context of the conversation was") and inconsistent testimony before the DAB as to what she actually heard ("dummy" versus "you dummy") and whether she actually observed the patient at that time do not amount to substantial evidence. That is, this evidence does not constitute "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached," *R.P. Carbone*, 166 F.3d at 818, nor is it "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury," *Payne*, 402 F. App'x at 111. At best, Scully heard Lerner speak the word "dummy," but she did not hear the context in which it was used or to whom it was directed, and she did not hear or see any indication that the patient was upset at that time. Therefore, again, this evidence does not amount to substantial evidence in support of the inappropriate conduct charge that Lerner called the patient's wife a "dummy."

Finally, the ninth piece of evidence to which the VA refers—Pfeffer's testimony—actually has nothing to do with any complaints *against* Lerner. The VA quotes a portion of Pfeffer's testimony in which Pfeffer talks about wanting "to go through step by step the oral response, or the written response" but states that Lerner refused. Read in context, Pfeffer's comments are in relation to complaints made *by* Lerner, not *against* Lerner. (*See* Admin. R. at 201 (Hr'g Tr. at 194:23–195:12).) In fact, the only reference during Pfeffer's testimony to Lerner's use of the word "dummy" appears when Pfeffer is asked to review a July 1 email received from Egolf (presumably, the Scully-Hunt-Egolf email (Admin. R. at 276)). (*See* Admin. R. 200 (Hr'g Tr. at 190).) There, Pfeffer merely states his opinion that: "[I]t is very disrespectful to a patient to call a patient a dummy. And it is not the reflection I want on

our medical center." (*See* Admin. R. 200 (Hr'g Tr. at 190).) This piece of evidence in no way supports the DAB's conclusion relative to Specification A.

Accordingly, having reviewed the DAB's written decision and the record as a whole, the Court finds that the portion of the DAB's decision sustaining the charge of inappropriate conduct relative its determination that Lerner called a patient's wife a "dummy" is not supported by substantial evidence and must be set aside.

**2.      The DAB's determination that Lerner used the term "gorilla" with respect to a patient's son is supported by substantial evidence.**

As for the second part of Specification A, the VA points to thirteen pieces of evidence as supporting the DAB's finding that Lerner told an African-American patient that his son was a "big gorilla." That evidence can be summarized as follows:

(1)   Egolf's "Report of Contact" in which she documented her conversation with the patient and the patient's wife. Egolf's report states that the patient told Egolf that Lerner "told him something to the effect that he needed to exercise like his son and that his son was a 'big gorilla.'" (Admin. R. at 277.)

(2)   Egolf's notes from the *Weingarten* meeting held on July 13, 2011. Egolf's notes reflect that Lerner denied calling the patient's son a "big gorilla" and did not remember the specific conversation. Egolf's notes also reflect that Lerner stated that he liked the word gorilla, that he calls himself a gorilla, and that if he had used that term it would have been in a positive way. According to Egolf's notes, Lerner also stated that the wording was being taken out of context and told Egolf that she was "way, way, way, way, way . . . off base." (Admin. R. at 270-71.)

(3)   Egolf's testimony before the DAB in which Egolf read her Report of Contact. Egolf testified that "[the patient] went on to say that Dr. Lerner had told him that he needed to exercise his son and that he called his son a big gorilla." Egolf also testified that the patient's wife told Egolf that "she wondered if perhaps

they were being treated in this manner because they were African American." (Admin. R. at 164 (Hr'g Tr. at 38-39).)

(4)    Egolf's testimony before the DAB in which Egolf read her notes from the *Weingarten* meeting held on July 13, 2011. (Admin. R. at 164 (Hr'g Tr. at 46-48).)

(5)    Egolf's testimony before the DAB in which she opined that she thought it was inappropriate to call a patient or family member a gorilla. (Admin. R. at 169 (Hr'g Tr. at 66).)

(6)    Scully's testimony before the DAB in which she testified that she had heard Lerner use the term "gorilla" with staff members and patients, both white and African American, "in the context of exercise or physical fitness." (Admin. R. at 172 (Hr'g Tr. at 76-77).)

(7)    Scully's testimony before the DAB that, in her opinion, it would be inappropriate to call an African American or a member of an African-American's family a gorilla. (Admin. R. at 173 (Hr'g Tr. at 81).)

(8)    Nurse Patricia Barnett's (Barnett) testimony before the DAB in which she testified that she had never heard Lerner deliberately insult a patient but stated that "he might jokingly comment to a patient and they might take it wrong." (Admin. R. at 175 (Hr'g Tr. at 91-92).)

(9)    Barnett's testimony before the DAB in which she stated that she had heard Lerner use the term "gorilla." There, Barnett testified: "It's usually in a positive way because he is always talking to patients about, you know, how they need to get exercise and, you know, you know, they need to get out there and get healthy and if a patient comes in, he's been exercising, he's been doing all he needs to do, he's feeling good, he'll joke with them and say you are a gorilla." Barnett went on to say, "he's never said it, I've never heard him say it in a negative way." (Admin. R. at 176 (Hr'g Tr. at 92-93).)

(10) Pfeffer's testimony before the DAB in which Pfeffer opined that "[t]o treat a patient with disrespect or call an African-American a gorilla, to me, is unacceptable." (Admin. R. at 203 (Hr'g Tr. at 201).)

(11) Testimony before the DAB by Robert Peterson (Peterson), an x-ray technician at the VA, in which Peterson testified that he and Lerner had used the term "gorilla" for each other in regard to the exercises he and Lerner had done together. Peterson, who is white, testified: "It's not [an] insulting term. It's just because of the exercises that we do, we just try to encourage people. And if it was demeaning, or, they felt that [sic] disrespected, that's not the intent." (Admin. R. at 222 (Hr'g Tr. at 278).)

(12) Lerner's testimony before the DAB in which Lerner acknowledged using the term "gorilla" with dozens of patients over the years. Lerner further testified that he used the term indiscriminately whether the person was black, white, Asian, male, or female, and that no one had ever taken offense to its use. (Admin. R. at 242 (Hr'g Tr. at 359).)

(13) Lerner's testimony before the DAB in which Lerner explained the context in which he would have used the term "gorilla." There, Lerner testified:

Q. [T]he patient also reported that you told him [he] needed to exercise like his son. And, that you referred to his son as a big gorilla. Or, words to that effect. Can you explain the context of how you used that phrase?

A. Yeah, [w]ell, we've heard, in terms of exercising. Once again, you've got to be strong. You've got to be a beast. . . . That's how I used the term . . . .
And, I probably got out of them that their son might have been a high school basketball player, football player. Something along those lines. And patients, per se, you know, when you start talking exercise and movement and the things that are really going to help patients over the long haul to remain functional.
. . . So I've got to implore that [they] do things that they haven't learned. The skills that are taking care of themselves as they get older. So once again, in this case. Spoke to this patient. He's got to be like your son, he's a

> big, hulking kid, scrapping football player. Or, whatever he
> was something like that.
>
> Q. Okay. Did you use the term any differently than you use
> with your colleagues?
>
> A. No, no. Not at all. As a matter of fact, I even use it with
> my wife. . . .

(Admin. R. at 225 (Hr'g Tr. at 289-90).)

Again, Egolf's Report of Contact, *Weingarten* meeting notes, and testimony before the DAB (numbers (1), (2), (3), and (4) above) are all hearsay. Applying the eight factors laid out in *R.P. Carbone*, for the same reasons as discussed above, the Court finds that this hearsay evidence does not constitute substantial evidence. Egolf's, Scully's, and Pfeffer's opinions about what generally is or isn't offensive or disrespectful (numbers (5), (7), and (10) above) have no bearing on the ultimate question before the DAB, nor do Barnett's postulations that Lerner might "joking comment to a patient and they might take it wrong" (number (8) above). However, Scully's, Barnett's, and Peterson's testimony (numbers (6), (9), and (11) above) that Lerner has used the term "gorilla" with them and/or with patients—a point which Lerner concedes—does amount to substantial evidence that, irrespective of context or intent, Lerner did use that term with respect to a patient's son. Accordingly, the Court finds that the DAB's determination that Lerner used the term "gorilla" with respect to a patient's son is supported by substantial evidence and need not be set aside on this basis.

### B. Specification B

In regard to Specification B, the question before the Court is whether the DAB's determinations that Lerner asked a patient's wife "who's the patient here?" and that the use of that language was demeaning and inappropriate are supported by substantial

evidence.  In its written opinion, the DAB began by acknowledging that Lerner did not recall the encounter but testified that if he had used that language it would have been for the purpose of redirecting the conversation back to the patient.  (Admin. R. at 10.)  The DAB agreed with Lerner that circumstances in which family members intrude on the physician-patient dialogue "do occur regularly"; however, the DAB reasoned that "there are far better alternatives to the approach used by [Lerner]."  (Admin. R. at 10.)  The DAB then concluded that "[t]he language 'who's the patient here' is demeaning and inappropriate" and that "the weight of the evidence is sufficient to sustain this Specification."  (Admin. R. at 10.)

The DAB did not explain further its reasoning in this regard, nor did the DAB make clear the specific evidence on which it made its determination.[7]  In its Response, the VA references six items in the record that it says amount to substantial evidence:

> (1)  Egolf's "Report of Contact" in which she documented her conversation with the patient and the patient's wife.  Egolf's report states that the patient's wife told Egolf that Lerner "said something to the effect of 'who's the patient here.'"  (Admin. R. at 277.)

> (2)  Egolf's notes from the *Weingarten* meeting held on July 13, 2011.  Egolf's notes reflect that Lerner did not recall the encounter, "doubted he said that," and "stated maybe they misunderstood."  (Admin. R. at 270-71.)

> (3)  Pfeffer's testimony before the DAB in which he testified about a meeting with Lerner and Lerner's refusal to discuss specifics with Pfeffer.  (Admin. R. at 201 (Hr'g Tr. at 195).)

---

[7] The DAB does offer one citation to five lines of Lerner's testimony in which he stated:  "So, in the context of that, what I said to the patient was most likely to try to redirect.  Like, you know, who's the patient here?  Jokingly.  To try to redirect from the spouse back to the patient.  I really want to get the information from the patient themselves.  I'm really not interested in how many epidurals the spouse has had in the past or etc."  (Admin. R. at 10 (citing Admin. R. at 225 (Hr'g Tr. at 291:9–:14)).)

(4)     Egolf's testimony before the DAB in which Egolf recounted her telephone conversation with the patient and his wife. Egolf testified that the patient's wife told Egolf that "at one point Dr. Lerner said who's the patient here" and that "she wondered if perhaps they were being treated in this manner because they were African American." (Admin. R. at 162 (Hr'g Tr. at 38-39).)

(5)     Lerner's testimony before the DAB in which he did not deny that he might have used the phrase "who's the patient here?" There, Lerner testified: "I always like to have family members in there because we impart lots of information. . . . [M]ore often tha[n] not, when we start talking to the patient, it's usually a male veteran. The spouse will jump in and start talking about their [own] pain problems. So, in the context of that, what I said to the patient was most likely to try to redirect. Like, you know, who's the patient here? Jokingly. To try to redirect from the spouse back to the patient. I really want to get the information from the patient themselves. I'm really not interested in how many epidurals the spouse has had in the past . . . ." (Admin. R. at 225 (Hr'g Tr. at 291).)

(6)     Lerner's previous admonishment for referring to a patient as a "clown." (Admin. R. at 337-39.)

Upon considering the evidence cited by the VA and the record as a whole, the Court finds that the DAB's determination relative to Specification B is not supported by substantial evidence. For the same reasons discussed above in regard to Specification A, Egolf's Report of Contact, *Weingarten* meeting notes, and testimony before the DAB (numbers (1), (2), and (4) above) are all hearsay and, applying the eight factors laid out in *R.P. Carbone*, do not constitute substantial evidence. Also for much the same reasons as discussed above, neither Pfeffer's testimony nor Lerner's prior admonishment (numbers (3) and (6) above) have any bearing on whether Lerner used the phrase "who's the patient here?" and, if so, whether his use of that language was demeaning

and inappropriate. Finally, Lerner's testimony at best evinces that he *might* have used that phrase, but it in no way establishes that that he actually did. Further, even assuming Lerner's testimony did amount to substantial evidence that he said "who's the patient here," it does not establish that his use of that language was "demeaning and inappropriate" as the DAB concluded. Quite simply, it is not such relevant evidence as a reasonable mind might accept as adequate to support the DAB's conclusion that the weight of evidence was sufficient to sustain Specification B. *See R.P. Carbone*, 166 F.3d at 818.

Accordingly, after reviewing the DAB's written decision and the record as a whole, the Court finds that the DAB's decision to sustain the charge in Specification B is not supported by substantial evidence and must be set aside.

### C.      Specification C

In regard to Specification C, the question before the Court is whether the DAB's determinations that Lerner told a patient "the nurse quit" and "the surgery department is trying to get rid of me" and that the use of that language constituted inappropriate conduct are supported by substantial evidence. In its written opinion, the DAB began by acknowledging that Lerner testified "he did not specifically remember this encounter[] but testified that it was unlikely that he used [that] language." (Admin. R. at 10.) The entire remainder of the DAB's written decision relative to Specification C states:

> The Board noted that [Lerner] testified on multiple occasions that he had little control over the pain department, that he lacked space and resources and that the nurse practitioner had quit and was not replaced, substantially increasing [his] workload. Given [Lerner's] past record and also his demeanor during the hearing the Board determined that the weight of the evidence supported the charge

> [that Lerner] had used this language during the patient encounter
> and that the language constituted Inappropriate Conduct.

(Admin. R. at 11 (citations omitted).)

The VA again points the Court to a number of items in the administrative record that it says support the DAB's conclusion:

(1) Nurse Gordon's July 7, 2011, email to Egolf. In that email, Gordon relays a conversation with a patient in which the patient told Gordon that Lerner told the patient that "he had to wait 6 months [to receive an epidural pain block] because the nurse quit and [Lerner] was doing them all by himself" and "that the surgery dept is trying to get rid of him." (Admin. R. at 275.)

(2) Egolf's notes from the *Weingarten* meeting held on July 13, 2011. Egolf's notes reflect that Lerner did not recall the encounter and denied making either of those comments to the patient. (Admin. R. at 272-73.)

(3) Egolf's testimony before the DAB in which she read her notes from the July 13 *Weingarten* meeting. (Admin. R. at 165 (Hr'g Tr. at 49-50).)

(4) Gordon's testimony before the DAB in which Gordon recounted her telephone conversation with the patient. Gordon testified, in relevant part, that the patient said he was "a little concerned about some of the things that have been said to me about a nurse quitting" and that "Dr. Lerner told him that the hospital was trying to make him quit." (Admin. R. at 188 (Hr'g Tr. at 141).)

(5) Lerner's testimony before the DAB in which Lerner testified that the "patient was particularly unhappy at a time that we had just lost out nurse practitioner." When asked whether he told the patient that the surgery department was trying to get rid of him or make him quit, Lerner responded: "That would be highly unlikely. I tend not to discuss my personal affairs with patients." (Admin. R. at 225-26 (Hr'g Tr. at 292-93).)

(6) Lerner's testimony before the DAB in which he stated that he had little control over the Pain Clinic, that a nurse practitioner had in fact quit, and that her quitting had increased Lerner's workload. (Admin. R. at 224, 226 (Hr'g Tr. at 286, 293).)

Though a closer call, upon considering the evidence cited by the VA and the record as a whole, the Court finds that the DAB's determination relative to Specification C is not supported by substantial evidence. The DAB's decision identifies Lerner's past record and lack of remorse at the hearing as the foundation for its decision; however, neither of those considerations has any bearing on the question whether Lerner did, in fact, tell a patient that "the nurse quit" and "the surgery department is trying to get rid of me" or whether that language constitutes inappropriate conduct.

For the same reasons discussed above, Egolf's *Weingarten* meeting notes and testimony before the DAB are hearsay and do not constitute substantial evidence. Gordon's email and testimony also are hearsay and, as such, must be analyzed under *R.P. Carbone*'s eight factors. In this instance, the patient's statements are not signed and sworn, and are contradicted by Lerner's sworn testimony before the DAB. There is no indication in the record that the patient was unavailable to testify. There is no evidence to corroborate the patient's statements as to what Lerner did or did not say to him. Moreover, Gordon gave inconsistent accounts of the precise language Lerner was purported to have used, writing in her email "Dr[.] Lerner told him that the surgery dep[artmen]t is trying to get rid of him" but testifying before the DAB that "Dr. Lerner told him that the hospital was trying to make him quit." (*Compare* Admin. R. at 275, *with* Admin. R. at 188 (Hr'g Tr. at 141).) Unlike Egolf, for whom it made an express credibility determination, the DAB did not state whether it found Gordon credible. (Notably, the DAB also did not make an express credibility determination relative to

Lerner.[8])    When viewed in light of these factors, the Court cannot conclude that Gordon's email and/or testimony amount to substantial evidence in support of the conclusion that Lerner did, in fact, tell a patient that "the nurse quit" and "the surgery department is trying to get rid of me," or that doing so amounted to inappropriate conduct.

Furthermore, in this instance, Lerner's testimony does not substantiate the DAB's conclusion.    The fact that Lerner testified that a patient was unhappy about having to wait twice as long for a pain block does not establish that Lerner made the charged comments to that patient, nor does his testimony that he had little control over the Pain Clinic, that a nurse practitioner had in fact quit, or that his workload had increased as a result.    This testimony at best provides a set of circumstances in which the charged comments could be made; it does not, however, amount to more than a scintilla of evidence that those comments actually were made. Moreover, Lerner consistently denied making those comments, both in the *Weingarten* meeting and in his sworn testimony before the DAB.    Therefore, to the extent the DAB's decision relied upon Lerner's testimony, its conclusion that Lerner "had used this language during the patient encounter and that the use of the language constituted Inappropriate Conduct" is not supported by substantial evidence.

Accordingly, after reviewing the DAB's written decision and the record as a whole, the Court finds that the DAB's decision to sustain the charge in Specification C is not supported by substantial evidence and must be set aside.

---

[8] While the DAB did reference Lerner's "demeanor during the hearing," the DAB appears to be referring to Lerner's lack of remorse and not whether it otherwise found Lerner to be a credible witness.

**II.      Arbitrary and Capricious**

Lerner also argues that the DAB's decision should be set aside as arbitrary and capricious.  As stated above, "[t]he arbitrary and capricious standard . . . is met when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome."  *Sea Ray*, 164 F.3d at 989.  And "[a]lthough the court may not supply a reasoned basis for the agency's action that the agency itself has not given, a decision of less than ideal clarity should be upheld if the agency's path may reasonably be discerned."  *Taylor*, 92 F. App'x at 276-77 (citing *Lansing Dairy, Inc.*, 39 F.3d at 1355). Thus, the Court must uphold the DAB's decision if it is found to be "the result of a deliberate principled reasoning process."  *Evans*, 434 F.3d at 876.  Upon reviewing the administrative record, the Court finds that the DAB's conclusions relative to Specifications A, B, and C, as well as its decision in regard to the penalty imposed were arbitrary and capricious in light of the evidence before it.

In regard to Specification A, the DAB offered little in the way of explanation why it concluded that Lerner had used the terms "dummy" and "gorilla" in reference to a patient's family members or why it concluded that the use of that language necessarily constituted inappropriate conduct.  A plain reading of the DAB's written decision suggests that it found the use of those terms amounted to inappropriate conduct because of "[Lerner's] past disciplinary record and lack of expressed remorse during the hearing."  (*See* Admin. R. at 10.)  Similarly, in regard to Specification B, the DAB offered little explanation as to why the language "who's the patient here" is necessarily "demeaning and inappropriate" aside from summarily remarking that "there are far better alternatives to the approach used by [Lerner]."  (*See* Admin. R. at 10.)  And

finally, in regard to Specification C and the comments "the nurse quit" and "the surgery department is trying to get rid of me," the DAB's written decision again suggests that that it found those comments amounted to inappropriate conduct because of "[Lerner's] past record and also his demeanor during the hearing." (*See* Admin. R at 10-11.) However, even assuming Specifications A, B, and C were supported by substantial evidence,[9] it is not possible, based on the evidence of record, to offer a reasoned explanation why the DAB concluded that Lerner's actions constituted inappropriate conduct.

For one, the DAB made no reference to any objective standard or criteria why any of Lerner's alleged comments—irrespective of the context in which they are used—are necessarily inappropriate. The Court has reviewed the VA Code of Conduct and been unable to locate the term "inappropriate conduct." (*See* Admin. R. at 362-76.) The most analogous provision appears to be the prohibition against the "use of insulting, abusive, or obscene language to . . . patients." (Admin. R. at 365.) But neither Gaar's proposed suspension, (Admin. R. at 36), Pfeffer's notice of suspension, (Admin. R. at 41), nor the DAB written decision, (Admin. R. at 10-11), make any reference to this provision, and, in fact, none of these documents accuse Lerner of using "insulting, abusive or obscene language."

The District of Arizona's decision in *Abaqueta v. United States*, 255 F. Supp. 2d 1020 (D. Ariz. 2003), a case also brought under § 7462(f) by a VA physician, provides a useful comparison on this point. There, Dr. Abaqueta, an anesthesiologist, was charged

---

[9] As discussed above, in regard to Specification A, the Court finds that the portion of the DAB's decision that Lerner used the term "gorilla" with respect to a patient's son is supported by substantial evidence; however, the portion of the DAB's decision relative to its determination that Lerner called a patient's wife a "dummy" is not.

with "unprofessional conduct" and "patient abuse" arising out of an incident in which he palpated an anesthetized patient's breasts. Two nurse anesthetists witnessed Dr. Abaqueta's actions and filed written reports on the incident. Dr. Abaqueta was subsequently discharged and appealed his discharge to the DAB. Before the DAB, Dr. Abaqueta testified that he palpated the patient's breasts out of "medical interest" and his "own clinical interest." *Id.* at 1023-24. The DAB upheld the discharge, concluding that Dr. Abaqueta: "touched the patient's breast because he was curious and wanted to feel the implant. His manner of touching . . . did not constitute a medical examination of the patient." *Id.* at 1024. The DAB's written opinion also noted that, relative to the penalty chosen, the medical center director "testified he made his decision based on the evidence of record and the fact that he questioned several prominent anesthesiologists concerning whether [Dr. Abaqueta's] action constituted appropriate behavior." *Id.* Furthermore, the DAB heard expert testimony from a recently retired anesthesiologist and professor of ethics in regard to the relevant professional standard and whether Dr. Abaqueta's conduct amounted to unprofessional misconduct for an anesthesiologist. On review, the district court upheld the DAB's decision, reasoning that "[t]he ethical standard was a question of fact for the Appeals Board to determine based on the qualification and testimony of the expert witnesses." *Id.* at 1026.

In contrast to *Abaqueta*, here the DAB did not hear any expert testimony to establish an objective standard for what constitutes inappropriate conduct or whether Lerner's conduct violated that standard. Nor did the DAB hear any evidence establishing objective criteria for what is or is not appropriate communications by a pain-management physician to his patients. Instead, despite discounting the testimony

of Egolf, Gaar, and Pfeffer, the DAB seemed content to employ its own subjective standard, based on its impressions of Lerner and his apparent lack of remorse at the hearing, and to determine that Lerner violated that standard. Because the DAB both failed to identify and utilize any sort of objective measure and to offer a reasoned explanation why Lerner's conduct constituted inappropriate conduct, the Court finds its decision arbitrary and capricious.

Furthermore, the penalties imposed against Lerner—both the initial ten-day suspension and the DAB's subsequent reduction to a five-day suspension—were arbitrary and capricious as well. Not surprisingly, given the lack of an objective standard for the charges against Lerner, the VA apparently could not even decide on the seriousness of the charged offenses. Gaar's proposed suspension described Lerner's conduct as "very serious" and "completely unacceptable." (Admin. R. at 37.) Yet, as Gaar testified and the DAB noted in its written decision, "[Gaar] admitted that he knew little or nothing about the results of the fact finding. . . . [I]t is not clear that he even knew the contents of the [proposed suspension] letter when he signed it." (Admin. R. at 12.) Pfeffer, in his notice of suspension, wrote that the "seriousness of the offense," among other factors, warranted a ten-day suspension. (Admin. R. at 41.) However, when questioned by the DAB Chairman whether the agency gave any consideration to conducting an administrative investigation where witnesses could be called (as opposed to the informal fact finding that was conducted by Egolf), Pfeffer responded: "I thought about that, because we do some, but I didn't think that it rose to that level, to do a formal investigation. Employee misconduct wasn't egregious enough, I wouldn't think to do an [administrative investigation]." (Admin. R. at 209 (Hr'g Tr. at 226-27).) What

is clear is that the VA did not believe that any of Lerner's alleged "inappropriate conduct" had been either deliberate or intentional.[10] (*See* Admin. R. at 213, 218 (Hr'g Tr. at 241, 262).) So, despite finding that Lerner's unintentional, nondeliberate conduct was insufficiently serious to warrant an investigation beyond informal fact finding, the VA nonetheless decided that Lerner's conduct was sufficiently serious to merit a ten-day suspension.

Additionally, the process by which the VA decided to impose a ten-day suspension is unclear and cannot be reasonably discerned, and does not appear to be the result of a deliberate principled reasoning process. At the hearing before the DAB, the VA introduced a "Table of Penalties" for adverse actions against Title 38 employees. Vaught, the VAMC's human resources specialist, testified that "what we attempt to do in Human Resources is, if the charge is not specifically spelled out in the Table of Penalties, we relate it to the most near instances that has occurred." (Admin. R. at 212 (Hr'g Tr. at 237-38).) Vaught analogized Lerner's conduct to the offenses of "abuse of patients" or "abusive or obscene language towards about or [sic] other personnel." (Admin. R. at 212 (Hr'g Tr. at 238).) However, neither Gaar's proposed suspension nor Pfeffer's final decision make any reference to this Table or Penalties or either of the analogized charges. (*See* Admin. R. at 34-36, 39-40.) Indeed, it is not entirely clear

---

[10] Vaught, the VAMC's human resources specialist, testified:

> Q. So, as a HR Specialist, it's your opinion whatever conduct occurred, it
>     was not deliberate?
> A. No, I do not believe it was deliberate.
> Q. Okay.
> A. Or, intentional.

(Admin. R. at 218 (Hr'g Tr. at 262).) Counsel for the VAMC took the same position in his closing statement to the DAB: "The Agency doesn't believe think [sic] they were intentional or deliberate." (Admin. R. at 243 (Hr'g Tr. at 364).)

who decided on the penalty imposed. Vaught testified that human resources typically will meet with the employee's supervisor to provide a recommendation based on the Table of Penalties. (Admin. R. at 210-11 (Hr'g Tr. at 232-33).) But the testimony before the DAB illustrated that Gaar, Lerner's supervisor, had all but entirely removed himself from the process. In fact, when asked "Are you aware of the charges that gave rise to you proposed suspension," Gaar responded, "Just from what I've reviewed briefly before coming in here." (Admin. R. at 192 (Hr'g Tr. at 158).) Pfeffer, on the other hand, testified that he had reviewed the charges with Gaar and that Gaar had provided significant input:

> A. I met with Dr. Gaar and he then went through each of the charges and talked about the rationale . . . and gave me a clear picture of why they were charging what they were charging.
>
> . . . .
>
> Q. And what was [Gaar's] view?
>
> A. That this was sustainable that Dr. Lerner was very arrogant and in fact to him, to where he had a hard time in his office talking one on one to Dr. Lerner.
>
> Q. So, [Gaar] participated actively in the -- in the process of giving you information . . . ?
>
> A. Yes.
>
> Q. He was more than merely a conduit of information or somebody through whom the recommendation from HR was made?
>
> A. Again, he relied on HR, and even did a lot of leg work, so Dr. Gaar did elaborate on dealings with Dr. Lerner and some of the specifics of the charges. So, he certainly knew about it and gave me input.

(Admin. R. at 203 (Hr'g Tr. at 201-02).)   In view of the many inconsistencies and shortcomings running throughout the fact-finding investigation and into the decision to suspend Lerner, the Court cannot conclude that the VA's decision was the result of a deliberate principled reasoning process and, accordingly, finds that the penalty imposed by the VA was arbitrary and capricious.

Furthermore, the DAB's decision to reduce that penalty to a five-day suspension also was arbitrary and capricious.   As an initial matter, the selection of a five-day suspension appears entirely arbitrary.   The DAB offered no meaningful explanation why a five-day suspension was warranted.   Because the decision to uphold any suspension runs contrary to the whole of the DAB's written decision, the Court cannot reasonably discern the DAB's reasoning.

More importantly, perhaps, the DAB failed to appropriately consider and weigh the *Douglas* factors in assessing an appropriate penalty against Lerner.   For this reason also, the Court finds that the penalty imposed by the DAB was arbitrary and capricious. The *Douglas* factors, first laid out in *Douglas v. Veterans Admin.*, 5 M.S.P.B. 313 (1981), represent a nonexhaustive list of factors that courts and review boards should consider when determining appropriate penalties.[11]   Those factors may be aggravating, neutral, or mitigating, which accordingly may justify a more or less severe penalty.

---

[11] The *Douglas* factors include:
(1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;
(2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;
(3) the employee's past disciplinary record;

In conjunction with the decision to suspend Lerner, Pfeffer completed a *Douglas* factors checklist and characterized seven of the twelve factors as aggravating. (Admin. R. at 332-34.) Despite making no express mention of the *Douglas* factors in its written decision, the DAB apparently agreed with Pfeffer on two of the aggravating factors— namely, the first factor ("seriousness of the offense") and the third factor ("employee's past disciplinary record"). (*See* Admin. R. at 12, 332.) The DAB's written decision suggests that it found an additional aggravating factor in that "[Lerner] has not shown remorse or admitted to some degree of wrongdoing." (*See* Admin. R. at 12.) But the DAB failed to consider or even acknowledge the five other factors that Pfeffer had found to be aggravating. The DAB did, however, devote the bulk of its discussion to the eleventh factor, "[m]itigating circumstances surrounding the offense." In that discussion, the DAB pointed out a number of mitigating factors relative to the penalty imposed, including: (1) that "[t]he Agency conducted a very inadequate fact finding process prior to laying charges"; (2) that Gaar delegated the entire investigation to Egolf and "admitted that he knew little or nothing about the results of the fact finding"; (3)

---

(4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

(5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties;

(6) consistency of the penalty with those imposed upon other employees for the same or similar offenses;

(7) consistency of the penalty with any applicable agency table of penalties;

(8) the notoriety of the offense or its impact upon the reputation of the agency;

(9) the clarity with which the employee was on notice of any rules that where violated in committing the offense, or had been warned about the conduct in question;

(10) potential for the employee's rehabilitation;

(11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and

(12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

5 M.S.P.B. at 332.

that Gaar "relied solely on HR to craft the suspension proposal and it is not clear that he even knew the contents of the letter when he signed it"; (4) that "Egolf was not an unbiased third party"; (5) that Egolf "was not a good candidate to conduct essentially the entire fact finding process"; (6) that the VA had "alternative fact finding mechanisms such as an administrative investigation," but did not employ those mechanisms; (7) that "there was significant conflict between the testimony of [Gaar] and [Pfeffer] regarding the role of [Gaar] in issuing the suspension proposal"; (8) that "[t]his conflict undermines the credibility of the Agency with regard to the suspension"; and (9) that the VA had not offered Lerner "any counseling, employee assistance or communication skills training after the admonishment" but "had a responsibility to offer such assistance." (Admin. R. at 12-13.) In view of the list of mitigating factors the DAB recognized, the Court cannot discern the DAB's reasoning in deciding to reduce Lerner's suspension by half.

Furthermore, the DAB failed to consider several significant mitigating circumstances that would seem to further undermine the charges against Lerner and the reasonableness of the penalty imposed. For one, the DAB failed to consider whether Lerner's conduct "was intentional or inadvertent." *See Douglas*, 5 M.S.P.B. at 332. The evidence of record invariably showed that Lerner's actions were unintentional, a point that counsel for the VA expressly conceded in closing arguments before the DAB. (*See, e.g.*, Admin. R. at 218, 243 (Hr'g Tr. at 262, 364).) For another, the DAB made no mention of a curious and seemingly noteworthy fact relative to the patient complaints against Lerner—namely, that they all came about within a three-week period. The DAB also made no mention that this three-week period occurred

immediately after Lerner circulated an email to Gaar's superiors concerning instances of attending physicians leaving the VAMC premises and leaving residents unsupervised in the operating room. Given that the record is replete with evidence of the contentious working relationship between Lerner and Gaar, and between Lerner and Egolf, the DAB should have considered this factual aspect as a mitigating factor. *See Douglas*, 5 M.S.P.B. at 332 (identifying the eleventh enumerated factor as "mitigating circumstances surround the offense such as unusual job tensions, personality problems, . . . malice or provocation on the part of others involved in the matter . . . ."). Thus, there may have been other reasons for investigating Lerner and pursuing disciplinary action against him that should have been considered by the DAB but were not. To quote the Western District of New York's decision in *Ward v. Derwinski*, a case where the penalty imposed against a VA nurse was found arbitrary and capricious, the penalty imposed on Lerner "simply fails the 'Doesn't add up' test." 837 F. Supp. 517, at 524 (W.D.N.Y. 1992) (quoting *Stephens v. Derwinski*, 790 F. Supp. 29, 31 (D.D.C. 1992)).

Therefore, based upon its review of the DAB's written decision and the administrative record, the Court finds that both the original ten-day suspension and the DAB's decision to reduce that suspension to five days were arbitrary and capricious. As such, the DAB's decision must be set aside.

## CONCLUSION

Having considered the administrative record and the parties' respective arguments, for the foregoing reasons, the Court finds that the decision by the Disciplinary Appeals Board is deficient under 38 U.S.C. § 7462(f)(2). As such, that

decision will be set aside and the penalty imposed on Lerner vacated in its entirety. An appropriate Order will issue separately with this Opinion.

Date:

cc:     Counsel
        AUSA